UNITED STATES of America, Appellee,

v.

William BARTON, Anthony Chirico, Rosario Chirico, Dominic "Sonny" Celestino, Betti Frassetto, Frank Frassetto and Angelo Vaccaro, Defendants-Appellants.

Nos. 357 and 402 to 406, Dockets 80–1096, 80–1102, 80–1103, 80–1116, 80–1117 and 80–1130.

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1980.

Decided March 27, 1981.

Rehearing Denied April 27, 1981.

---

Kate Stith Pressman, Dept. of Justice, Washington, D. C. (Richard J. Arcara, U. S. Atty., W. D. New York, Donald J. Wisner, Dept. of Justice, Rochester, N. Y., William C. Bryson, Dept. of Justice, Washington, D. C., on brief), for appellee.

James L. Kemp, Rochester, N. Y., for defendant-appellant Barton.

Ronald S. Carlisi, Rochester, N. Y., for defendant-appellant Anthony Chirico.

Alfred P. Kremer, Rochester, N. Y., for defendant-appellant Rosario Chirico.

Jerrold B. Reilly, Rochester, N. Y., (Joan De R. O'Byrne, Rochester, N. Y., on the

brief), for defendant-appellant Dominic Celestino.

Charles A. Schiano, Rochester, N. Y., (James L. Hendricks and Charles O. Baisch, Rochester, N. Y., on brief), for defendants-appellants Betti Frassetto and Frank Frassetto.

John L. LaDuca, Rochester, N. Y., (LaDuca & McGinn, Rochester, N. Y., on brief), for defendant-appellant Angelo Vaccaro.

Before MOORE, NEWMAN, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

William Barton, Anthony Chirico, Rosario Chirico, Dominic "Sonny" Celestino, Frank Frassetto ("Frassetto"), his wife, Betti Frassetto ("Betti"), and Angelo Vaccaro appeal from judgments entered in the United States District Court for the Western District of New York convicting them on all counts of an indictment, after a trial before a sequestered jury and the Honorable Lloyd F. MacMahon, Judge, now Chief Judge, of the United States District Court for the Southern District of New York, sitting by designation. The trial and convictions related to a series of bombings and attempted bombings in Rochester, New York, between December 1977 and June 1978, depicted as part of a struggle between rival underworld factions to gain control of gambling and other unlawful enterprises in the Rochester area. The theory of the prosecution was that the appellants represented one faction, seeking to unseat the rival group headed by one Salvatore Gingello. Gingello, who was released from jail in February 1978, was eventually killed when a bomb exploded under his car on April 23, 1978.

In a fourteen-count indictment, described in greater detail in the margin,[1] most appellants other than Betti Frassetto were charged with possession of destructive devices in violation of 26 U.S.C. §§ 5861(d), (f), and 5871 (1976), and with malicious damage to buildings in violation of 18 U.S.C. § 844(i) (1976); all appellants except Betti Frassetto were charged with conspiring to perform the above acts in violation of 18 U.S.C. § 371 (1976), and to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and (d) (1976); and appellants Anthony Chirico and Betti and Frank Frassetto were charged with endeavoring to obstruct justice, in violation of 18 U.S.C. § 1503 (Supp. III 1979). After a three-week trial, appellants were convicted on all counts, and were

---

1. Count One of the indictment charged all the appellants except Betti Frassetto with conspiracy under 18 U.S.C. § 371 to make, receive, and possess destructive devices in violation of 26 U.S.C. §§ 5861(d), (f), and 5871, and to maliciously damage buildings in violation of 18 U.S.C. § 844(i).

Count Two charged all appellants except Barton and Betti Frassetto with unlawfully receiving and possessing destructive devices in violation of 26 U.S.C. §§ 5861(d) and 5871 between January 1, 1978 and March 2, 1978.

Counts Three, Five, Seven, and Nine charged Celestino and Frank Frassetto with possession of destructive devices in violation of 26 U.S.C. § 5861(d) at various times in May and June of 1978. Count Seven named Anthony Chirico as well. Count Eleven charged Frassetto and Anthony Chirico with possession of such devices on June 28, 1978.

Counts Four, Six, Eight, and Ten charged Celestino and Frank Frassetto with maliciously damaging, or attempting to damage, by means of an explosive, buildings used in interstate commerce, in violation of 18 U.S.C. § 844(i). Counts Eight and Ten named Anthony Chirico as well. Count Ten alleged that unidentified persons were injured in the explosion.

Count Twelve charged Celestino, Anthony Chirico, and Frank Frassetto with the unlawful receipt and transportation of stolen explosive materials between May 11 and June 28, 1978, in violation of 18 U.S.C. § 842(h) (1976).

Count Thirteen charged all appellants except Betti Frassetto with conspiring, in violation of 18 U.S.C. § 1962(d), to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). This Count also named as a defendant one Stanley Valenti, whose case was severed thereafter on the ground that he was not competent to stand trial.

Count Fourteen charged Anthony Chirico, Frank Frassetto, and Betti Frassetto with endeavoring to obstruct justice with regard to the grand jury investigation of the other crimes charged in the indictment, in violation of 18 U.S.C. § 1503.

sentenced to prison terms ranging from two years to thirty years.[2]

We affirm the convictions.

### FACTS

The government's case-in-chief was presented primarily through the testimony of 108 witnesses. As appellants make only limited attacks on the sufficiency of the evidence to convict them, an abbreviated summary will suffice to place the discussion of the most serious issues in proper perspective.

The government's main witnesses included Rodney Starkweather and Gary Haak, who were allied in various ways with appellants in their bombings and attempted bombings. Haak, a former business partner of Rosario Chirico, was engaged by the latter on various occasions to assemble remote control detonation devices. Starkweather, who opened an "after-hours" bar with leave of appellants' faction, became a confidant of appellants, purchasing explosives for them, meeting with them several times a week, and participating in some of the bombing efforts.

The bombing attempts directed at Gignello and his associates commenced in December 1977, when Barton, Celestino, and Vaccaro sought, unsuccessfully, to detonate a bomb on the car of a Gignello associate. In February 1978, appellants placed a bomb in a telephone booth at the Blue Gardenia restaurant, which Gignello had been known to visit daily. Their scheme to lure Gignello into the telephone booth failed in the execution. In late February or early March 1978, Celestino and Starkweather several times placed bombs in a snowbank outside the Blue Gardenia. They succeeded in detonating one such bomb, but failed to kill Gignello on that occasion. Finally, on April 23, 1978, Celestino, with the aid of Vaccaro and Frassetto, placed and detonated a bomb under Gignello's car, killing Gignello and injuring two of his companions.

In the period following Gignello's death, appellants directed their attentions chiefly toward two buildings that housed gambling operations run by Gignello's associates: the Social Club of Monroe, located at 1266 Clifford Avenue ("Clifford building"), and the 1455 Social Club, located at 1455 University Avenue ("University building"). It appears that most of these bombing attempts succeeded. Celestino and Starkweather exploded bombs damaging the Clifford building on May 19 and June 8. And Frassetto, Celestino, and Starkweather exploded a bomb damaging the University building on May 22.

On June 18, Celestino and Frassetto were arrested.[3] After the arrest, Frassetto telephoned Starkweather and asked him to go to Frassetto's house to pick up any "stuff"

2. Barton was sentenced to a total of ten years' imprisonment: five years on Count One and ten years on Count Thirteen, to be served concurrently.

Anthony Chirico was sentenced to a total of fifteen years' imprisonment: five years on Counts One and Fourteen, ten years on Counts Two, Seven, Eight, Eleven, and Twelve, and fifteen years on Counts Ten and Thirteen, all to be served concurrently.

Rosario Chirico was sentenced to a total of twenty-five years' imprisonment: concurrent terms of ten years on Count Two and twenty years on Count Thirteen, to be followed by five years on Count One.

Celestino was sentenced to a total of thirty years' imprisonment: concurrent terms of five years on Count One and ten years on each of Counts Two through Nine and Count Twelve, to be followed by two concurrent twenty-year terms on Counts Ten and Thirteen.

Frank Frassetto was sentenced to a total of thirty years' imprisonment: five years on Counts One and Fourteen and ten years on Counts Two through Nine and Eleven and Twelve, all to be served concurrently, to be followed by two concurrent twenty-year terms on Counts Ten and Thirteen.

Vaccaro was sentenced to a total of twenty-five years: concurrent terms of ten years on Count Two and twenty years on Count Thirteen, to be followed by a five-year term on Count One.

Betti Frassetto was sentenced to two years' imprisonment on Count Fourteen.

All the appellants have begun serving their sentences except Betti Frassetto who remained free pending this appeal.

3. The arrest took place after a police chase, following which the police found weapons and other items along the chase route. These were introduced at trial.

that was there. Starkweather went to the house and was given a garbage bag by Betti Frassetto, which contained a New York State dealer's license plate and other items that were not identified at trial. Apparently certain incriminating evidence had already been moved from Frassetto's house. Starkweather testified that sometime between June 8 and June 18, Frassetto had told him that he had moved "the stuff" from his basement to the back of a Wise Potato Chip truck. The truck, which Frassetto had bought for use in surveillance of the Gignello faction, was generally kept either at Frassetto's house or at a certain Arco service station. On or prior to June 28 Frassetto made several abortive attempts to have the truck moved from the service station.

On June 28, two agents from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") approached the attendant at the Arco station, Frederick Ledtke, to ask who owned the Wise Potato Chip truck. The attendant did not know, but put the agents in touch with the owner of the station. The owner later called Vincent Frassetto, Frank's brother, and asked how he could contact Betti Frassetto. Vincent Frassetto called his home, where Betti and Frank Frassetto had been staying, and relayed the station owner's telephone number to his wife, Margaret.

Margaret Frassetto testified that she gave the message to Betti and that in her presence, Betti made a telephone call, and asked who was asking about the truck. Margaret testified that Frank Frassetto asked Betti to go to the Arco station to see what was going on, and Betti said she would. At Frank's request Margaret got permission from her neighbor to use the neighbor's telephone, because Frank feared the Frassettos' phone was tapped. Betti

made a call on the neighbor's telephone, then borrowed the neighbor's car, a green Dodge with a vinyl top. Ledtke, the service station attendant, testified that between 11:30 a. m. and 12:30 p. m. on June 28 he received a telephone call from a woman whom he did not know, asking who was making inquiries about the truck. When Ledtke responded that the inquirers were special agents, the woman said that she would be right down. A short time later, a woman arrived at the station in a green car with a vinyl top. The woman asked Ledtke if he was the person she had spoken to, and asked again about the men who had questioned him about the truck. Ledtke asked the woman if she had the keys to the truck. According to Ledtke, the woman said she too was looking for the keys, and then "kind of under her breath she said how am I going to move the truck—." The woman then left the station. At trial, Ledtke was unable to identify the woman in the green car as anyone in the courtroom. An ATF agent who had been watching the station on June 28, testified that shortly after noon, a woman arrived in a green car, got out, and walked around the truck inspecting it.[4]

Later on June 28, Frassetto finally got Starkweather and Anthony Chirico to go to the Arco station, remove a beer cooler from the truck, and throw it into the bushes behind the service station. Starkweather and Chirico were followed from the station by ATF agents and apprehended. The cooler was recovered by ATF agents; in it were found explosives, blasting caps, timing devices, and electrical boosters.

## DISCUSSION

Appellants have made numerous attacks on their prosecution, raising such issues as the timing of their trial[5] and a veritable

---

4. Ledtke testified that the woman in the green car was in the station just long enough for him to service her car with gasoline and that she remained in the car the entire time. He also testified, however, that he had been in the station office when she arrived, and there was testimony that the truck was not visible from the office.

5. Appellants contend that they are entitled to a dismissal of the indictment on grounds that their trial did not commence within the then-applicable 80-day period provided by the Speedy Trial Act, 18 U.S.C. §§ 3161 et seq. (1976). This argument is without merit. The 80 days were to be computed from the date on which the last defendant was arraigned. *See*

checklist of other claims. Few of their contentions merit extended discussion.[6]

## A. *Voir Dire*

Appellants claim numerous defects in the court's voir dire which, they argue, was inadequate to safeguard their constitutional rights to be tried by an impartial jury. They contend principally that overcrowding in the courtroom created a chaotic atmosphere that resulted in anti-defense bias, and that the court's questioning was inadequate to ascertain the effects of the widespread pretrial publicity generated by the case and to allow an adequate screening of the venire. We disagree.

 The conduct of the voir dire is entrusted to the broad discretion of the trial judge, *United States v. Barnes*, 604 F.2d 121, 137 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), and an appellate court will not interfere with the manner in which it has been conducted absent a clear abuse of discretion. *United States v. Taylor*, 562 F.2d 1345, 1355 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); *United States v. Tramunti*, 513 F.2d 1087, 1114 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *Silverthorne v. United States*, 400 F.2d 627, 638 (9th Cir. 1968). Our review of the record in this case convinces us that there was no abuse of discretion in the conduct of the voir dire.

The twelve jurors and six alternates were chosen from an array of 250 persons. The court, in its initial address to the entire array, briefly described the charges, introduced all the attorneys and defendants, and read the names of every prospective witness and inquired whether the prospective jurors knew or had any kind of relationship with any of them. The court made similar inquiries about the victims in the case, as well as the restaurants and social clubs involved, and inquired as to any relationship with law enforcement agencies and the like. The court's final question to the entire venire was whether anyone would be influenced in any way by the fact that a number of the defendants and some of their attorneys had names of. Italian extraction. After this general questioning session, the judge addressed specific questions to the individual veniremen in the jury box. Any potential juror who stated that he or she had read or heard anything about the case was questioned individually in the jury room in the presence of all the defendants and their attorneys. One hundred and fifteen veniremen were questioned in the jury box before the jury was finally selected, and neither the government nor the defense exercised all of its peremptory challenges.

We note further that prior to the voir dire defendants made a motion for a change of venue, which the court denied as premature, without prejudice to its renewal after

---

§§ 3161(c)(1) and 3161(h)(7). Various delays were properly excluded from the § 3161 computation because they related to such matters as determination of Valenti's competence to stand trial, § 3161(h)(1)(A), or determination of various motions by the defendants, § 3161(h)(1)(F), or were needed for defendants' trial preparation, *see* § 3161(h)(8). With the exclusion of such periods, the trial was timely commenced.

**6.** The contentions not discussed include claims

—that there was prosecutorial misconduct before the grand jury, including use of the terms "Team A" and "Team B," to avoid using terms such as "Mafia" and "Cosa Nostra";

—that the indictment was not handed down within the term of the grand jury;

—that the government should have been ordered to provide a bill of particulars;

—that various items of physical evidence should have been suppressed;

—that the government should have been ordered to provide in unredacted form Jencks Act (18 U.S.C. § 3500) material that had previously been reviewed by appellants' counsel in unredacted form, but which appellants were unable to state contained redacted exculpatory material;

—that the court should not have replaced a juror whom it had observed to be daydreaming during trial and whose correspondence stated that he had been daydreaming during trial;

—that certain evidence was inadmissible;

—that various portions of the charge were erroneous.

We have reviewed all of appellants' claims and find them to be without merit.

the voir dire if defendants felt it necessary. Not only did appellants not renew that motion after the jury selection was complete, but counsel for Rosario Chirico stated, "we feel the jury is satisfactory as constituted and [are] prepared to go forward." No defendant demurred. We are satisfied that appellants' complaints regarding the voir dire are without merit.

## B. Evidence with Respect to Interstate Commerce under § 844(i)

■ Celestino and Frank Frassetto seek reversal of their convictions under Counts Four, Eight, and Ten, charging them with bombing and attempting to bomb the Clifford building, and Count Six charging them with bombing the University building, in violation of 18 U.S.C. § 844(i). They contend that there was insufficient proof that these buildings were used in interstate commerce, and that the trial court's instructions on interstate commerce were erroneous. Anthony Chirico makes the same arguments insofar as he is charged in Counts Eight and Ten.

Section 844(i) provides as follows:

(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

With respect to the alleged violations of this section, the judge gave the jury the following instruction on interstate commerce:

The second fact which the government must prove, beyond a reasonable doubt, in this second group of crimes is that the building was used in interstate commerce or in any activity [a]ffecting interstate commerce.

"Interstate commerce" means commerce or business between any place in one state and another place outside of that state. It also means commerce between places within the same state, but passing through any place outside of that state.

A building is used in, or in an activity [a]ffecting interstate commerce if food or drink moving in interstate commerce is sold there, or if oil or gas moving in interstate commerce is used to heat the building, or if the owner of the building is insured against loss or damage to the building by an insurance company that does business in more than one state.

Appellants argue that the instruction was erroneous, and that there was insufficient evidence that any food moving in interstate commerce was sold in the buildings.[7] We reject both arguments.

The language of § 844(i), referring to "any building ... used in ... any activity affecting interstate or foreign commerce," is very broad. Our sister circuits have interpreted it, in accordance with its breadth, to reach commercial buildings used in activities that have even a *de minimis* effect on interstate commerce. *E. g., United States v. Schwanke,* 598 F.2d 575 (10th Cir. 1979); *United States v. Sweet,* 548 F.2d 198 (7th Cir.), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977). In *Sweet,* a local tavern owner had procured the bomb-

---

7. Appellants appear to argue also that this charge improperly took the interstate commerce element away from the jury. Again, we disagree. The question whether the conduct alleged has in fact occurred is for the jury; the question whether that conduct affected interstate commerce may be decided by the court. *United States v. DiFrancesco,* 604 F.2d 769, 775–76 (2d Cir. 1979), *rev'd on other grounds,*

—— U.S. ——, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *United States v. Rone,* 598 F.2d 564, 573 (9th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). *See United States v. Calder,* 641 F.2d 76 (2d Cir. 1981) (Hobbs Act); *United States v. Ricciardi,* 357 F.2d 91, 94 (2d Cir.), *cert. denied,* 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540 (1966).

ing of the competing tavern across the street. The only evidence that the destroyed tavern was used in a business affecting interstate commerce was that it served liquor; although the liquor was purchased from local distributors, and served to local customers, it had originated out of state. This evidence sufficed to bring the tavern within the class of buildings Congress intended to cover in § 844(i). In *Schwanke*, the owner of a building procured the bombing of his own building, in which he leased space to a cafe that purchased candy, gum, and vegetables from out of state. Again this evidence was found sufficient to warrant invocation of § 844(i).

These interpretations of § 844(i) are supported by the legislative history of the statute. The report of the Judiciary Committee of the House of Representatives described the section in part as follows:

> Since the term affecting [interstate or foreign] "commerce" represents "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause," *NLRB v. Reliance Fuel Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963), *this is a very broad provision covering substantially all business property.* While this provision is broad, the committee believes that there is no question that it is a permissible exercise of Congress [*sic*] authority to regulate and to protect interstate and foreign commerce.

H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. 70 (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007, 4046 (emphasis added).

■ In the present case we are persuaded that the evidence adequately demonstrated that the Clifford and University buildings were used in activities affecting interstate commerce within the meaning of § 844(i). There was ample evidence that the buildings were used for commercial activities.[8] They housed the gambling activities that were the Gignello faction's princi-

pal source of income. The question is whether their commercial activity affected interstate commerce. We conclude that it did. There was undisputed proof that the "social clubs" which ran the gambling business served food and drink to those who attended. Among the food served at the Clifford building were orange juice and coffee which, perforce, originated outside of New York State. Coffee was served also at the University building, which was open 24 hours a day. In addition, there was evidence that the fuel used to provide heat and light for the clubs (and presumably to prepare the coffee) originated out-of-state. Appellants' argument that there was no evidence that the orange juice served at the Clifford building was in fact "being sold or that its presence there was anything other than a mere incident to gambling," (Brief of Rosario Chirico, et al., on appeal, at 34), misses the mark. There is no contention that the orange juice or coffee, even if sold, was thereby entering interstate commerce. *See United States v. Sweet, supra.* Its interstate character was its provenance; the principal commercial activity was the gambling, to which the service of orange juice was concededly "incident." To the extent, therefore, that jurisdiction under § 844(i) was based on evidence that the businesses conducted at the Clifford and University buildings served food that had traveled in interstate commerce or were operated by means of fuel that originated out-of-state, we find no error.

■ To the extent that the court instructed the jury that interstate commerce was affected if a building was insured by an insurance company that does business in more than one state, the question is less clear. We are inclined to believe that the mere fact that a building is insured by an interstate carrier does not meet even the *de minimis* standard for showing that the activity of the building affected interstate commerce. In light, however, of the fact

---

8. This readily distinguishes our recent decision in *United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981), in which we held that § 844(i) does not apply to private dwellings, notwithstanding several interstate contacts involving financing, insurance, fueling, and use of building materials.

that these are jurisdictional, rather than substantive, elements of the government's case and in view of the adequacy of the undisputed evidence as to the alternative jurisdictional predicates, we conclude that any error in giving the insurance portion of the charge was harmless. *See United States v. Ricciardi*, 357 F.2d 91, 96 (2d Cir.), *cert. denied*, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540 (1966).

## C. *Evidence with Respect to Interstate Commerce Under § 1962*

Appellants make a similar challenge to the jurisdictional predicate for the RICO charge, Count Thirteen. That count charged appellants other than Betti Frassetto with conspiring in violation of 18 U.S.C. § 1962(d) to violate § 1962(c), which provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

As to the charges under this section the trial judge pointed out that the government's contention was that appellants' activities "did [a]ffect" interstate commerce, and instructed the jury to apply the interstate commerce principles he had described in connection with the § 844(i) counts. Appellants argue that their acts "did not impact upon" interstate commerce within the meaning of § 1962 (Brief of Rosario Chirico, et al., at 33), and that "[t]here never was any proof in this case that appellants here were part of a nationwide crime syndicate [or] that their activities reached into other states ...." (*Id.* at 35.)[9] We disagree.

Preliminarily it should be noted that § 1962(c) has an even more expansive jurisdictional predicate than does § 844(i). Section 844(i) deals with malicious destruction of property, and the jurisdictional predicate of a charge under that section is *property* used in an activity affecting interstate commerce. The focus of § 1962(c) is not so restricted. Its concerns are not limited to destruction of property, but rather extend to "activities" affecting commerce where there is a pattern of racketeering activity. Although the court's instructions to the jury did not clarify this difference, we think the failure to do so could only have benefited, not prejudiced, the appellants.

In determining what connections with interstate commerce must be proven by the government to establish a violation of § 1962, the courts have ruled that the impact need not be great. So long as the activities of the enterprise affect interstate commerce, the jurisdictional element is satisfied. *United States v. Altomare*, 625 F.2d 5, 8 n.8 (4th Cir. 1980); *United States v. Rone*, 598 F.2d 564, 573 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Nerone*, 563 F.2d 836, 851 (7th Cir. 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978). In accordance with this view, we have upheld an instruction that interstate commerce was affected if the defendant who resided in New York purchased a house in New Jersey in connection with the illegal enterprise. *United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980). In *Mannino* we stated as follows:

> [Mannino] faults the court's instruction permitting the jury to find that Mannino's purchase of a house in Atlantic City, New Jersey, constituted an activity by an enterprise affecting interstate commerce. This instruction was not erroneous, espe-

---

**9.** In *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977), we held that § 1962 applies even to enterprises that are illegal. Appellants invite us to overrule *Altese* and to follow the contrary rule adopted in *United States v. Turkette*, 632 F.2d 896 (1st Cir. 1980). We have repeatedly declined such invitations, *United States v. Errico*, 635 F.2d 152 (2d Cir. 1980); *United States v. Mannino*, 635 F.2d 110 (2d Cir. 1980), and we similarly decline here. In passing, we note that the Supreme Court has recently granted certiorari in *Turkette*. *See* —— U.S. ——, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

cially in view of Judge Sweet's express qualification to the instruction permitting such a finding only "if you find that the purchase was connected directly or indirectly with the illegal enterprise, and that there is a connection, a nexus between the activities of the enterprise and the purchase of the property in Atlantic City." Moreover, our conclusion that no error was committed here is strengthened by the presence of ample other evidence of interstate effects, e. g., the dispatch of couriers to Florida to pick up the drug shipment, which established a strong basis for the necessary jurisdictional finding.

*Id.* at 118.

█ In the present case we similarly find no prejudicial error in the court's charge, especially in light of the ample evidence of the effects on interstate commerce. In addition to the evidence with respect to the Clifford and University buildings that were bombed by appellants, *see* Part B, *supra,* there was evidence, for example, that Gignello's car, blown up by appellants, was insured by an interstate insurance carrier. Although we are skeptical that § 844(i) would have reached the bombing of Gignello's car on this basis, the broader focus of § 1962(c) persuades us that the latter section encompasses this bombing activity. *See United States v. DiFrancesco,* 604 F.2d 769, 775 (2d Cir. 1979), *rev'd on other grounds,* —— U.S. ——, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980) (payment by insurance companies in New York and other states of $480,000 in claims resulting from arson and mail fraud had requisite effect on interstate commerce under § 1962(c)). Further, the attempted bombings of the Blue Gardenia restaurant had an admitted impact on interstate commerce. Witnesses who had supplied the restaurant with liquor and fish that had come from other countries and other states testified that after the bombing attempts, the restaurant's purchases declined significantly. Appellants concede that "the loss of business was due to unfavorable reporting about the attempted assassination of Salvatore Gignello." (Brief of Rosario Chirico, et al., at 34.) In addi-

tion, appellants made several interstate telephone calls to and from New York in their quest for explosive devices needed for their activities, and Vaccaro, Celestino, and Frassetto traveled from New York to Ohio, Virginia, and West Virginia, in order to obtain explosives.

Accordingly, appellants' contention that the government failed to establish that their activities affected interstate commerce is meritless.

### D. *Double Jeopardy*

Appellants Celestino, Vaccaro, Rosario Chirico, and Frank Frassetto argue that the consecutive sentences imposed on them as a result of their convictions on the two conspiracy counts (Counts One and Thirteen) violated the Double Jeopardy Clause of the Constitution, which "protects against multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnote omitted). Appellants point out that the gist of a conspiracy offense is the agreement rather than its goals, and, relying principally on *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), they argue that "if there is only one agreement, there is but one punishable offense though its objectives may be multiple." (Brief of Dominic Celestino, et al., on appeal, at 55.) They contend that the imposition of consecutive sentences for the RICO conspiracy and the conspiracy to possess explosives and damage buildings was improper because the two conspiracies involved only one agreement, namely, appellants' agreement to attempt to take over illegal gambling and related activities in the Rochester area. Even assuming that there was but one agreement, we conclude that appellants' reliance on *Braverman* is misplaced and that the imposition of consecutive sentences was proper.

In *Braverman,* the Court held that a single agreement with multiple objectives involving separate substantive offenses is only a single conspiracy that cannot be punished more than once under a single conspiracy statute. The Court stated that

[t]he single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute, § 37 of the Criminal Code. For such a violation, only the single penalty prescribed by the statute can be imposed.

*Id.* at 54, 63 S.Ct. at 102. The Court distinguished the situation in *Braverman*, however, from a charge involving "a single act which violates two statutes." *Id.*

▮ It is undisputed that a single transaction may give rise to liability for distinct offenses under separate statutes without violating the Double Jeopardy Clause. This is true whether the offenses be substantive crimes, *Harris v. United States*, 359 U.S. 19, 79 S.Ct. 560, 3 L.Ed.2d 597 (1959); *Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), or crimes of conspiracy. *Albernaz v. United States*, —— U.S. ——, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *American Tobacco Company v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). The question whether the offenses are distinct requires an analysis of the two statutes and of whether Congress intended to allow cumulative punishments. *Albernaz v. United States, supra,* —— U.S. at ——, 101 S.Ct. at 1145 n.3. The standard has most often been stated in the context of substantive offenses. *E. g., Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) (charges of rape and of homicide committed in the course of the rape); *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (charges of auto theft and of operating a vehicle without the owner's consent). In *Brown*, the Court stated as follows:

> The established test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment was stated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):
>
> > "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . ."
>
> This test emphasizes the elements of the two crimes. "If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes. . . ." *Iannelli v. United States*, 420 U.S. 770, 785 n.17, 95 S.Ct. 1284, 1293 n.17, 43 L.Ed.2d 616 (1975).

432 U.S. at 166, 97 S.Ct. at 2225.

The same standard applies when Congress has provided separate statutes condemning conspiracies. The *American Tobacco* case provides an instructive parallel to the present case. There the defendants were convicted of conspiring to restrain trade in the tobacco industry in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and of conspiring to monopolize the tobacco industry in violation of § 2 of that Act, 15 U.S.C. § 2 (1976); separate fines were levied for each offense. The Court rejected a double jeopardy argument similar to that pressed here:

> On the authority of the *Braverman* case, petitioners claim that there is but one conspiracy, namely, a conspiracy to fix prices. In contrast to the single conspiracy described in that case in separate counts, all charged under the general conspiracy statute, . . . we have here separate statutory offenses, one a conspiracy in restraint of trade that may stop short of monopoly, and the other a conspiracy to monopolize that may not be content with restraint short of monopoly. One is made criminal by § 1 and the other by § 2 of the Sherman Act.
>
> We believe also that in accordance with the *Blockburger* case, §§ 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap.

*American Tobacco Co. v. United States, supra,* 328 U.S. at 788, 66 S.Ct. at 1128 (citations omitted).

Most recently, in *Albernaz v. United States, supra,* the Court has held that cumulative sentences may be imposed on defendants who have been convicted of conspiring to import marijuana in violation of 21 U.S.C. § 963 (1976), and of conspiring to distribute marijuana in violation of 21 U.S.C. § 846 (1976), notwithstanding that the defendants had entered into but a single agreement that had these dual objectives. Applying the *Blockburger* test, the *Albernaz* Court stated that "[s]ections 846 and 963 specify different ends as the proscribed object of the conspiracy—distribution as opposed to importation—and it is beyond peradventure that 'each provision requires proof of a fact [that] the other does not.'" —— U.S. at ——, 101 S.Ct. at 1142.

The present case fits within the teachings of *Albernaz* and *American Tobacco,* rather than *Braverman,* for the appellants here were charged and convicted under two distinct conspiracy statutes. Applying the *Blockburger* test, we find that in the RICO provision, 18 U.S.C. § 1962(d), Congress created an offense different from the preexisting general conspiracy statute in 18 U.S.C. § 371, and intended to allow cumulative punishments.

Our analysis begins with the provisions themselves. Section 371 provides in pertinent part as follows:

If two or more persons conspire either to commit any offense against the United States, ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Section 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

The maximum criminal penalty for violating § 1962(d) is a fine of $25,000, a prison term of twenty years, and certain forfeitures of property. 18 U.S.C. § 1963.[10] There are certain obvious differences between the two statutes. First, § 1962(d) is limited to conspiracies—involving a pattern of racketeering—to violate the other subsections of § 1962. It could not be invoked to reach, for example, a conspiracy to inflict malicious damage on buildings by means of explosive devices in violation of 18 U.S.C. § 844(i), or a conspiracy to possess such devices in violation of 26 U.S.C. § 5861; the violations described by these sections are not included within RICO's definition of racketeering.[11] On the other hand, in many

---

10. In addition, § 1963(b) gives the court certain injunctive powers, and § 1964 provides certain civil remedies.

11. Section 1961 defines racketeering activity as (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruc-tion of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the

instances § 371 could be invoked to reach a conspiracy to violate the substantive provisions of § 1962, since violation of any federal statute is an offense against the United States. *Cf. United States v. Butler*, 494 F.2d 1246, 1249 (10th Cir. 1974). Yet such a prosecution under § 371 would require proof of a fact not required under § 1962(d): the fact that one of the conspirators has "do[ne] an act to effect the object of the conspiracy." 18 U.S.C. § 371. While the general conspiracy statute requires proof of an overt act, the RICO conspiracy section does not. *See Singer v. United States*, 323 U.S. 338, 340–342, 65 S.Ct. 282, 283–284, 89 L.Ed. 285 (1945), in which the Court distinguished the general conspiracy statute from the special statute before it which did not mention such an element, and held that the latter did not require proof of an overt act. The RICO conspiracy statute, like the special statute considered in *Singer*, does not mention such an element, and the report of the Senate Judiciary Committee with respect to § 1962(d) made express reference to the *Singer* case. S.Rep. No. 91–617, 91st Cong., 1st Sess. 159 (1969). Finally, in some instances a prosecution under § 371 for conspiracy to violate § 1962 might be improper because the goals of the conspiracy were too farflung. *See United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), upholding use of § 1962(d) to reach "a myriopod criminal network, loosely connected but connected nonetheless," *id.* at 899, that involved arson, theft, fencing goods stolen from interstate commerce, murder, and narcotics activity, while observing that such a prosecution probably would not have been possible under § 371 because it linked "highly diverse crimes by apparently unrelated individuals," *id.* at 902.

Turning to the charges leveled in the present case, we see that § 371 was invoked with respect to the agreement to make, receive, and possess explosive devices in violation of 26 U.S.C. §§ 5861(d), (f), and 5871, and to maliciously damage buildings

felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous

in violation of 18 U.S.C. § 844(i). The RICO conspiracy charge, on the other hand, alleged violation of § 1962(c) by means of threats of arson and murder, by the actual murder of Gignello, and by the acts of arson at the Clifford and University buildings. While obviously appellants' acts of damage to the Clifford and University buildings provide an area of overlap between the substantive offenses underlying the two conspiracy charges, the substantive offenses are by no means congruent. The § 371 conspiracy count required proof of appellants' agreement to make, obtain, or possess unregistered explosive devices, and to damage or attempt to damage, the Clifford and University buildings by means of explosive devices. Proof of an agreement having these goals, however, was not needed to prove the RICO conspiracy; nor would such proof have been sufficient to prove that conspiracy, since the making or possessing of explosive devices, and the use of such devices to damage buildings are not acts of racketeering as defined by § 1961. The RICO conspiracy count required instead proof of agreements to commit murder or arson, and, in order to establish a "pattern" of racketeering, required proof of an agreement to perform at least two of the predicate acts. None of this evidence was required or sufficient to prove the conspiracy as charged in Count One. Hence we are convinced that § 371 and § 1962(d) created—and Counts One and Thirteen charged—two separate offenses.

We are equally convinced that Congress intended that a court be able to impose cumulative sentences for violations of those sections. Congress's express purpose in enacting the Organized Crime Control Act, of which RICO was Title IX and § 844(i) was part of Title XI, was to provide *increased* penalties for racketeering activity. Thus, the Statement of Findings and Purpose of that Act included the following statement:

It is the purpose of this Act to seek the eradication of organized crime in the

drugs, punishable under any law of the United States.

United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

P.L. 91–452, 84 Stat. 922 (Oct. 15, 1970). While the legislative history of § 1962(d) itself is sparse, the Report of the House of Representatives Judiciary Committee took care to point out that the enhanced penalties provided for racketeering activities were equally applicable to a § 1962(d) conspiracy:

> Subsection (d) makes conspiracy to violate (a), (b), or (c) equally subject to the sanctions of sections 1963 and 1964. . . .

H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. 57 (1970), *reprinted in* (1970) U.S.Code Cong. & Ad.News 4007, 4033.

To hold that cumulative sentences could not be imposed on Counts One and Thirteen in this case would plainly defeat Congress's intention to enhance the penalties imposed on those who conspire to engage in racketeering. If a penalty could be imposed only under § 371 for the conspiracy to violate § 1962, the maximum sentence would be reduced from a $25,000 fine and imprisonment for twenty years, to a $10,000 fine and imprisonment for five years. And if a penalty could be imposed only under § 1962(d), the conspiracy to possess destructive devices and to destroy buildings could not be punished at all. Accordingly, we uphold the sentences under Counts One and Thirteen.

### E. *Trial of Barton in Absentia*

On the eve of trial, appellant Barton underwent surgery and was unable to attend the trial. His motion for postponement or severance was denied, and he was tried in absentia. He contends that this constituted an abuse of the trial court's discretion. In view of the facts, we disagree.

■ It is beyond dispute that a defendant has a constitutional right to be present at the trial of charges against him. *Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973). It is well settled, however, that this right may be waived if the defendant voluntarily and deliberately absents himself from the trial without good cause. *E. g., United States v. Reed*, 639 F.2d 896 (2d Cir. 1981); *United States v. Pastor*, 557 F.2d 930 (2d Cir. 1977); *United States v. Tortora*, 464 F.2d 1202 (2d Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972). In the present case, the parties had agreed on November 14, 1979, that the voir dire would begin on January 8, 1980. Barton's attorney stated that Barton had no objection, and thereafter informed Barton of the date on which trial was to begin. Nonetheless, less than one week before trial, Barton elected to undergo spinal surgery. At the hearing on Barton's severance motion Barton's physician testified that, while medically necessary, the operation was not performed on an emergency basis; that he had diagnosed Barton's condition in August 1978, some 17 months earlier, and had several times thereafter unsuccessfully urged Barton to undergo surgery. He stated that Barton's request for surgery in January 1980 came "out of the blue."

■ In light of this evidence, we find no error in Judge MacMahon's conclusion that Barton's absence was voluntary. Given this fact and the fact that Barton was alleged to have participated in conspiracies with all of the other defendants except Betti Frassetto, and the additional circumstances that this multi-defendant trial involving more than 100 government witnesses had already been postponed more than once, that a panel of 250 veniremen had already been arranged, and that the trial judge was sitting by designation from another federal district, the trial court ruled that Barton's interest in being present at his trial was outweighed by the burdens that a postponement or severance would impose on the court, the government, the witnesses, the co-defendants, and the public. We find no abuse of discretion in the decision to proceed with trial despite Barton's absence.

## F. The Conviction of Betti Frassetto

 Finally, we turn to the claims of appellant Betti Frassetto. Betti was mentioned only in Count Fourteen of the indictment. That count charged her, Frank Frassetto, and Anthony Chirico with endeavoring on or about June 28, 1978, to remove or conceal the Wise Potato Chip truck or its contents in order to obstruct the grand jury's investigation into the possession and use of explosive devices in the underworld power struggle. Betti contends that her conviction must be reversed because her joinder for trial with the other defendants was improper under Fed.R.Crim.P. 8(b), because the evidence was insufficient to con-

vict her,[12] and because her conviction must have resulted from a "spillover" of the evidence introduced against her codefendants. We find none of these arguments persuasive.

 Rule 8(b) allows the joinder of a defendant who is not named in all counts of the indictment. *United States v. Weisman,* 624 F.2d 1118, 1129 (2d Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). The Rule expressly provides that two or more defendants may be charged in the same indictment if they are alleged to have participated in the same act or series of acts, and that all defendants need not be

12. The only other challenge to the sufficiency of the evidence is made by appellant Vaccaro with respect to Count Two, which charged him with possession of unlawful destructive devices between January 1, 1978, through March 2, 1978, in violation of 26 U.S.C. §§ 5845(a), (f), 5841, 5861, and 5871, and in violation of 18 U.S.C. § 2 (1976), which makes it unlawful to aid and abet the commission of a crime. Vaccaro contends that the evidence with respect to that period does not show that he aided or abetted anyone in the possession of explosives, but merely that he was associated and present with the other defendants. We reject this argument. The evidence was that when Starkweather first undertook to obtain explosives for the appellants during this period, he reported to Barton, who took him to a meeting with Celestino and Vaccaro. The next night, Starkweather delivered the explosives to Barton, Celestino, and Vaccaro in a motel room, and there instructed Celestino, in the presence of the others, how to mix and prepare them. Vaccaro regularly throughout January and February ("almost daily" as conceded by Vaccaro's brief on appeal) participated in meetings at which ways to obtain more explosives were discussed. Vaccaro was also a participant in the unsuccessful attempt to bomb the Blue Gardenia telephone booth and in the discussions of placement of the bombs in the snowbank outside that restaurant. Further, evidence as to Vaccaro's conduct before and after the period mentioned in Count Two was available to aid the jury in assessing Vaccaro's intentions in attending meetings and participating in discussions during the period. *Cf. United States v. Rapoport,* 545 F.2d 802, 805 (2d Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); Fed.R.Evid. 404(b). This evidence included testimony that Vaccaro was one of those who attempted in December 1977 to place a bomb on the car of a Gignello associate, and that in late March or early April Vaccaro telephoned a friend in Virginia to in-

quire about explosives, and drove with Celestino and Frassetto to Ohio, Virginia and West Virginia to obtain them.

To establish that a defendant has aided and abetted the commission of a crime the proof must show "that he in some sort associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *United States v. Bommarito,* 524 F.2d 140, 145 (2d Cir. 1975); *United States v. Clemente,* 640 F.2d 1069 (2d Cir. 1981). The jury was properly instructed with respect to aiding and abetting, and was told that a defendant could not be found guilty because of his mere presence or association. The charge included the following:

> You must be convinced, beyond a reasonable doubt, that the Defendant whom you are considering was intentionally doing something to cause or to aid or to forward the crime of the other person or persons; that the Defendant was a conscious, knowing, participant in the crime rather than a mere witness, spectator or bystander on the scene of a crime committed by another person or persons.

The evidence detailed above was sufficient to allow a rational jury to find beyond a reasonable doubt that Vaccaro had aided and abetted Celestino and others in the unlawful possession of explosives.

Finally, we note that there may have been evidence of Vaccaro's actual possession of explosives during the period in question. Vaccaro's brief on appeal states that during the early attempts to bomb Gignello at the Blue Gardenia in late February or early March, "Starkweather and Messers. [*sic*] Didio, Frassetto, *Vaccaro,* and Celestino retrieved the bomb because they were concerned that snow removal equipment would dis[t]urb it.... Later they reinserted the bomb...." (Brief of Dominic Celestino, et al., on appeal, at 10.) (Emphasis added.)

charged in each count. This Rule did not require the severance of Betti's case. Count Fourteen was integrally related to Counts Eleven and Twelve, which charged Frank Frassetto, Anthony Chirico, and Celestino with unlawful possession on June 28 of the explosives in the truck that Betti sought to move on that date. Her actions on June 28 were part of a series of actions relating to the unlawful possession and to the attempts by Frank Frassetto and Anthony Chirico to obstruct the grand jury investigation. It was not error to refuse to sever the count against Betti.

 Betti's challenge to the sufficiency of the evidence appears to take two forms. First, she contends that there was inadequate evidence from which the jury could infer that she was the woman who inquired about the truck, and second, she contends that the actions described in the proof are insufficient to constitute an endeavor to obstruct justice within the meaning of 18 U.S.C. § 1503. Viewing the evidence, as we must, in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we conclude that the evidence was sufficient.

The evidence that Betti was the woman who visited the service station and inquired about the truck, while circumstantial, was compelling. This evidence included testimony (1) that the Arco station owner, upon learning that the government agents were inquiring about the truck, attempted to reach Betti; (2) that Betti's brother-in-law relayed the station owner's telephone number to his wife, who in turn gave it to Betti; (3) that Betti then made a telephone call in which she asked who was inquiring about the truck; (4) that Betti's husband asked her to go to the Arco station and Betti said she would; (5) that Betti shortly thereafter borrowed a green car with a vinyl roof; and (6) that a woman in a green car with a vinyl roof arrived at the Arco station and asked the attendant if he was the person she had spoken to. These facts provided an ample basis for the jury to find that the woman in the green car was Betti.

Betti's argument that the acts attributed to her did not amount to an endeavor to obstruct the grand jury investigation presents a somewhat closer question. Section 1503 provides that whoever "corruptly ... endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5000 or imprisoned not more than five years, or both." The use of the term "endeavor[ ]" in this statute and its predecessor has been interpreted as embodying a concept less technical than that normally associated with an "attempt." The Court has construed the word "endeavor" as "describ[ing] any effort or essay to accomplish the evil purpose that the section was enacted to prevent." *United States . v. Russell*, 255 U.S. 138, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921); *Osborn v. United States*, 385 U.S. 323, 333, 87 S.Ct. 429, 434, 17 L.Ed.2d 394 (1966). In *Russell*, the Supreme Court considered the actions of an attorney who asked the wife of a possible juror to ascertain her husband's attitude toward the lawyer's client, stating that they did not want to pay money to any jurors at the trial unless they knew those jurors would favor acquittal. The attorney argued to the Court that his purpose was to learn the potential juror's attitude only in preparation for a bribe offer, but that his actions did not go so far as to constitute a solicitation, and hence were not an "endeavor." The Court rejected this contention, finding that such an experimental approach to the corruption of a juror constituted an "endeavor" within the meaning of the statute.

The evidence established that Betti's actions on June 28 also fit within this construction of the term "endeavor." Preliminarily, there is no question that Betti knew there was an ongoing grand jury investigation. On June 19, the day after her husband was arrested, she had gone to the police station and gotten his car, which had attached to its dashboard a search warrant stating that the car had been searched for explosives. A few days later, Betti herself was served with a grand jury subpoena and was informed that the investigation related

to recent bombings in Rochester. With this background, on June 28, she (a) telephoned the Arco station, taking care to do so from an untapped telephone, to find out who was asking questions about the potato chip truck, and when told the inquirers were government agents, said "I'll be right down"; (b) drove to the station and inspected the truck; (c) asked the station attendant again about the men asking questions; (d) said she was looking for the keys to the truck; and (e) said, "how am I going to move the truck."

We conclude that, taken in the light most favorable to the government, this evidence portrayed an effort or essay to move the truck in which the government was known to be interested. That Betti was unable to move the truck does not detract from her actions, which the jury could fairly infer were an endeavor to obstruct the grand jury's investigations.

■ Finally, we do not believe the trial of Betti with the other defendants was prejudicial to her. While Betti was not alleged to have had any role in the appellants' activities until June 28 [13], the actions attributed to her at trial were not complex. The evidence against her was relatively simple and easy for the jury to consider without any spillover effect from the proof adduced against other defendants. The likelihood of jury confusion seems quite remote.

## CONCLUSION

The judgments appealed from are affirmed.

---

13. The only mention of Betti prior to June 28 was Starkweather's testimony that after Frassetto's post-arrest request to go to Frassetto's house to pick up any "stuff" that was there, Starkweather went to the house where Betti gave him a garbage bag that contained unidentified items plus a transporter license plate.