**UNITED STATES of America,**

v.

**James E. LOFTEN, et al., Defendants.**

**No. S 80 Cr. 729 (GLG).**

United States District Court,
S. D. New York.

June 8, 1981.

See also, D.C., 507 F.Supp. 108.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City by Philip LeB. Douglas, Jane W. Parver, Benito Romano, Asst. U. S. Attys., New York City, for plaintiff.

Paul Goldberger, Goldberger, Feldman, Dubin & Young, New York City, for defendant Loften.

William Mogulescu, New York City, for defendant Harris.

Martin R. Stolar, New York City, for defendant Socolov.

Lester Hudson, Detroit, Mich., for defendant Morgan.

David Blackstone, New York City, for defendant Chin.

Lawrence Dubin, Goldberger, Feldman, Dubin & Young, New York City, for defendant Gainer.

Frederick Cohn, New York City, for defendant Starr.

Vincent Reale, New York City, for defendant Goodwin.

Jerry Feldman, Goldberger, Feldman, Dubin & Young, New York City, for defendant Linkhorn.

Jack Lipson, Legal Aid Society, New York City, of counsel, for defendant Stewart.

## MEMORANDUM DECISION

GOETTEL, District Judge.

Defendant Albert H. Socolov ("Socolov"), one of eleven defendants named in this ten-count indictment, has filed five substantive motions.[1] Socolov himself is named in only one count of the indictment, Count Nine, which charges a racketeering conspiracy in violation of section 1962(a) of Title 18, United States Code.[2] That section of the law, commonly referred to as RICO (Racketeer Influenced and Corrupt Organizations), has its own conspiracy subsection, which is paragraph (d) of section 1962. Socolov's motions, some of which require extensive consideration, are as follows:

1. to suppress the electronic surveillance evidence;[3]

2. to suppress use of certain of the electronic surveillance evidence as being privileged communications;

3. to suppress evidence obtained from Socolov's law offices by virtue of a search warrant;

4. to dismiss the indictment; and

5. alternatively, to sever the trial of this defendant from the trial of the other defendants.

The motions, except for the severance motion, as to which consideration has been deferred, will be considered in the order in which they arose chronologically in the Government's investigation.

*Background of the Investigation*

As is more fully described in this Court's Memorandum Decision of May 22, 1981, the investigation of the alleged Loften heroin ring arose from the Government's earlier investigation of the Todisco ring. *See United States v. Todisco*, (2d Cir. May 22, 1981) (Nos. 81–1052–1058). At the time the wiretap authorization was obtained for Loften's telephones, the Government apparently had no knowledge of Socolov's relations with Loften. Indeed, when their conversations were first intercepted, the Government did not even know that Socolov was an attorney. The first five-day report does not mention Socolov as being an attorney,

---

1. A number of discovery motions filed by him were decided earlier.

2. For a more complete description of this indictment, see this Court's Memorandum Decision of May 22, 1981. Because of the overlap between this opinion and the earlier one, some familiarity with the opinion of May 22 is assumed.

3. With respect to the other defendants, a similar motion was denied by this Court's Memorandum Decision of May 22, 1981.

although there were three conversations intercepted during that period. However, only one or two were of any consequence and it was not clear from the contents of the discussions that Socolov was an attorney. Only by use of a pen register, which gave the Government Socolov's telephone number, and a reverse directory, did the Government become aware that he was an attorney.[4]

When the United States Attorney's office became aware that Socolov was an attorney, it reviewed certain of the discussions and came to the conclusion that Socolov was giving primarily business advice, so that the conversations did not fall within the attorney-client privilege. It continued monitoring their numerous telephone discussions until the tap was terminated with Loften's arrest.

On November 1, 1980, following the arrest of Loften and other defendants in this case, the Government obtained a warrant to search Socolov's offices. The documents taken as a result were placed in a sealed box pending a motion to suppress. The Government also served a parallel grand jury subpoena on Socolov, which was also the subject of a motion challenging aspects of the subpoena.

An indictment was returned on November 10, 1980 with respect to the original narcotics offenses, but it did not contain a RICO count or name Socolov as a defendant. Thereafter, on February 5, 1981, a superseding indictment was obtained, which added counts against the other defendants and included the RICO count for conspiracy to violate the antiracketeering statutes, naming Loften, his cousin Roy Harris, James Jones (who is currently a fugitive), and Socolov as defendants. Following discovery, the motions under consideration were filed. They will be considered separately.

*Electronic Surveillance*

Besides supporting the arguments advanced by the other defendants in their motion to suppress the wiretap evidence— arguments already rejected by this Court— Socolov offers the following additional arguments:

1. There was inadequate probable cause to authorize interception of communications concerning purported RICO violations.

2. Normal investigative techniques were not exhausted with respect to the RICO offenses.

3. The scope of the search allowed became impermissibly broad.

4. The Government violated the authorizing order by overhearing attorney-client communications. (This argument will be considered under the next heading involving attorney-client privilege.)

 We start with the assumption that in a close case, doubts should be decided in favor of upholding the warrant. *See United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *United States v. Jackstadt*, 617 F.2d 12, 14 (2d Cir.), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). In focusing on the RICO violations separately, the defendant overlooks the interrelationship between the two grounds for the interception order. The existence of substantial assets and investments acquired by Loften was evidence of both heroin activities and possible violations of RICO. As this Court has already held, there was probable cause to indicate violations by Loften of the narcotics laws, 21 U.S.C. §§ 841, 846, and 848. Consequently, there was no need for independent support of probable cause for believing that RICO violations were occurring. The monitoring agents had authority to intercept the same conversations Socolov challenges, since they concerned substantial income and resources acquired by Loften in the course of a continuing criminal enterprise. Proof of the possession of large sums of cash by persons with no legitimate occupations is admissible as tending to prove that such money was derived from illicit sources. *See*

---

**4.** There is a slight confusion as to precisely when the Government obtained this information (either September 23 or 24, 1980), but, apparently, the five-day report had already been prepared.

*United States v. Barnes*, 604 F.2d 121, 146–47 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Viserto*, 596 F.2d 531, 536 (2d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979). Even if the conversations were not evidence of narcotics offenses as to which probable cause had been established, the interception would still have been lawful, since conversations pertaining to other crimes can be overheard if the issuing judge is subsequently apprised of this fact, so as to insure that the original wiretap order was not being used as a mere pretext for subsequent interception. 18 U.S.C. § 2517(5). *See, e. g., United States v. Maschiarelli*, 558 F.2d 1064, 1066–68 (2d Cir. 1977).

■ The argument that "normal investigative techniques" were not properly employed, and could have yielded evidence by which to shape a successful prosecution, is unreasonably fanciful. To suggest that Loften's investments (which had worldwide aspects to them) should have been located by conducting searches of county clerks' offices is clearly unreasonable. Many of Loften's investments either were not yet consummated (*e. g.*, the Arizona gold mine), or were in corporate names (*e. g.*, the Eighth Avenue Real Property), or would not have required filing (*e. g.*, the diamond ventures). Any attempt to obtain information from financial institutions by subpoena or otherwise would have rapidly brought the existence of the investigations to the target's attention. Finally, since the telephone was being used extensively as a means of pursuing the illegal investments, wiretapping was particularly appropriate. *See United States v. DePalma*, 461 F.Supp. 800, 813 (S.D.N.Y.1978).

Socolov also argues that the scope of the order was impermissibly broad because it authorizes electronic surveillance for evidence of "violations" of "Title 18 United States Code, sections 1962 *and 1963*" (emphasis supplied). Since section 1963 sets penalties for section 1962 and does not describe an "offense," the defendant argues that the electronic surveillance became the equivalent of a general search and that the conversations seized must be suppressed. *See United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978).

■ With respect to whether the wiretap application and the wiretap order were sufficiently particular, a pragmatic approach of considering the papers as a whole should be taken. *See United States v. Tortorello*, 480 F.2d 764, 780 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). Although the order refers to 18 U.S.C. § 1963, that section is modified by and is particularized by the citation to the preceding section, 1962. Moreover, Judge Carter's continuous supervision of the electronic surveillance imparts maximum specificity to the order and removes any doubt as to whether the agents had too broadly construed their authority. *See United States v. Steinberg*, 525 F.2d 1126, 1132 (2d Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). The order was meant to authorize the interception of conversations concerning Loften's acquisition of assets from revenues received through a pattern of narcotics trafficking, which assets would, therefore, be forfeitable. It is clear that the Government had authority to intercept conversations pertaining to "forfeitable assets" pursuant to the court's finding of probable cause with respect to the narcotics violations. The application and order were, therefore, sufficiently particular.

While Socolov also contends that the wiretap evidence must be suppressed because it is allegedly the illegal fruit of an earlier illegal wiretap, that earlier wiretap has since been upheld by the court of appeals for this circuit. *See United States v. Todisco, supra*. Moreover, it appears doubtful that Socolov would have standing to make such a challenge in any event, since he was not an aggrieved person (one whose conversation was intercepted) during the Todisco taps. *See United States v. Fury*, 554 F.2d 522, 525–26 (2d Cir.), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978). Consequently, all of the arguments discussed above, which were advanced to suppress the wiretap evidence, are rejected.

*Privileged Communications*

Between September 22, 1980 and October 31, 1980, the Government's wiretap overheard numerous discussions between Socolov and James Loften. Socolov argues that, since he is an attorney, it was clearly improper for the Government to listen to any of his conversations with his client, James Loften. The Government responds that, since the discussions were not attorney-client discussions, but were business discussions, there was no impropriety in listening. The truth lies somewhere between these two positions.

■ While the defendant's papers sometimes lose sight of the principle, it is important to remember that the attorney-client privilege belongs to the client and not to the attorney. Although the attorney can, and should, assert it, he does so for the benefit of his client.

It appears that the initial relationship between Socolov and Loften was that of attorney and client. It commenced in 1973 and was concerned solely with the purchase of several commercial buildings on Eighth Avenue in New York City. That relationship dwindled away around 1975, although Socolov kept up contacts with James Jones (a/k/a "Crooks") concerning these buildings. Sometime in late 1979 or early 1980, Socolov and Loften renewed their relationship. Initially, it apparently concerned only the same buildings on Eighth Avenue. However, by the time the wiretap commenced in September of 1980, their relationship, and matters of common interest, had grown enormously. In addition to taking an active role in the renovation and operation of the buildings on Eighth Avenue,[5] Socolov had become deeply involved in Loften's plans to enter into a gold mining venture. There were also discussions regarding the possibility of an international diamond brokerage business, the promotion of a singer, and even mineral resource acquisitions in Zimbabwe.

The gold mining venture involved the development of certain gold mine leases in Arizona. Socolov had accompanied Loften and Harris on an October visit to the sites. As a result of his interest in this matter, Socolov started doing research on the business of gold mining, including the costs of developing the mines. (It was also contemplated that Socolov's son, William, would work at the mines for two years.) Moreover, in addition to his becoming concerned primarily with business matters, it is apparent from some of his discussions with Loften that Socolov had developed a personal interest in the venture, and that it was interfering with his law practice. Indeed, at one point, he commented:

SOCOLOV: "Flying there, flying back. Ah, when I'm away I can't take care of things that are here that produce money. This thing has got a...I got a stake in this thing now. It's got to produce. It's got to produce money."

LOFTEN: "Oh yeah, it has to."

[SOCOLOV:] "My attitude really is that, if it warrants it, I will slowly but surely pull out of this active practice and turn over most of this stuff over to these young guys and, and ah, concentrate on these things. I want to concentrate on running a gold mine, and I have to do that."

LOFTEN: "Right."

\* \* \* \* \* \*

SOCOLOV: But it's got to be, I'm talking about big money. I can't, I can't function on a couple of thousand dollars. I got to have, I got to have large amounts of money."

(Call number A–870 (October 17, 1980).)

Defense counsel argues that there were substantial legal aspects to this venture and that a Securities and Exchange Commission registered public offering of shares was contemplated. The Court's interpretation of the conversations is directly to the contrary. While Loften suggested going public, Socolov quickly advised him that any

---

5. For example, in one of the conversations, Loften and Socolov discussed the installation of a jacuzzi and sauna in the basement of the building.

additional investment funds would have to be raised privately.[6]

The discussions about the proposed diamond brokering had no legal aspects at all. Socolov had a relative in the New York diamond market and Loften had foreign contacts interested in making purchases. It appears that Loften was to provide financing, while Socolov was to deliver the diamonds to the Asian purchasers. No attorney-client privilege was involved.[7]

One of the more exotic aspects of the Loften-Socolov conversations concerned the proposed visit by Loften to Zimbabwe, sponsored by its government, to inspect possible mineral resource acquisitions. Socolov had agreed to accompany Loften on this trip, which was scheduled for early 1981.

On occasion, in discussions that initially had no legal aspects, Socolov would inject some. For example, Loften was attempting to promote the singing career of a sixteen-year-old girl who was a friend of his. Socolov had a friend in the music business and offered to have him assist Loften's friend in making a record. Socolov then suggested that Loften's friend first be signed to a personal management contract and treated as an investment. This is typical of the kind of remark a lawyer volunteers when discussing business matters. (In a subsequent telephone discussion with Harris, Loften indicated his displeasure with Socolov's proposal.)

Thus, the telephone conversations reveal that a very close business relationship had developed between Socolov and Loften. Loften's conversations with his associates show that he thought Socolov could be useful to them because he was white and could gain access to businesses that might otherwise be closed to them. Loften and his associates also apparently thought Socolov was well within their control, was interested in the money to be made, and would do whatever they wanted. Harris indicated to Loften that Socolov was afraid of Harris, and the two apparently believed they had nothing to fear from Socolov. As Loften said to Harris: "Like I told the old asshole . . . he be a good boy, he'll come out being treated nice." Socolov's own statements quoted above, indicate that he was contemplating withdrawing from his law practice in order to manage the business investments of Loften and his associates. Indeed, he said that he would "concentrate on running a gold mine," provided that he received "large amounts of money."

■ The Court has reviewed all of the taped telephone conversations between Socolov and Loften. No privilege attaches to most of these conversations because they were not primarily for the purpose of securing legal opinions or legal services. *See Colton v. United States,* 306 F.2d 633, 637 (2d Cir. 1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). In the course of several of the taped conversations, Socolov did impart some legal advice.[8] However, these bits of legal advice were usually buried within discussions of primarily business matters. Of course, it is not unusual, or in any way improper, for a commercial attorney to proffer business advice; however, such conversations are not within the privilege. As Judge Lumbard noted in *Colton v. United States, supra,* 306 F.2d at 638: "Attorneys frequently give to their clients business or other advice which, at least insofar as it can be separated from their essentially professional legal services, gives rise to no privilege whatever."

An additional reason why these business conversations with legal overtones are not

<hr>

6. One curious aspect of the deal was that one of the sellers of the mining leases wanted to be paid in gold Krugerrands. Socolov agreed to deliver these personally to the seller in Arizona, stating that he would check them in with his baggage so as not to set off airport metal detectors.

7. Of course, it can also be argued that no investment in contravention of RICO was contemplated, since Socolov and Loften were merely to be middlemen who might share commissions.

8. *See* call numbers A–179 (September 23, 1980), A–243 (September 25, 1980), A–434 (September 30, 1980), A–486 (October 1, 1980), B–626 (October 24, 1980), and B–754 (October 29, 1980).

privileged is that, in most instances, they were not intended to be confidential. *See United States v. Kovel,* 296 F.2d 918, 922 (2d Cir. 1961). Moreover, Loften disclosed most of what Socolov told him to his other associates, including particularly Harris [9] and Jones.[10]

Some of the conversations concerned criminal charges. Socolov is primarily a commercial lawyer and now does only a very limited amount of criminal defense work. The principal criminal defense attorney giving advice to Loften and his associates at that time was Alvin Geller.[11] However, Geller and Socolov shared office space and their phone calls came in through the same switchboard. Moreover, since they both had the same nickname, "Al," some confusion may have occurred. It appears, however, that Loften would speak to Socolov when he could not reach Geller and that he kept Socolov advised of the status of the developing criminal investigation, although he did not seek legal advice from him about it.

For example, on October 24, 1980, narcotics agents executed a search warrant at the Harlem Variety Store, arresting a number of persons, including James Jones (a/k/a "Crooks"). A small amount of heroin and some gambling paraphernalia were found. Shortly thereafter, Socolov telephoned Loften to tell him of Jones's arrest (Socolov had also represented Jones) and the fact that Geller had been contacted. Loften speculated on whether the arrest was federal or state, and Socolov opined that it was probably the local police breaking up a numbers operation, since it competed with

the New York State Lottery. When Loften learned that Jones had, in fact, been arrested by federal authorities, he asked Socolov to verify this fact, which he saw as somehow being related to their Arizona gold mine plans. In his ongoing discussions with Alvin Geller, Loften informed Geller of his discussions with Socolov. When Loften feared calling Jones directly, he asked Socolov to do so on his own behalf. Socolov did so and reported back to Loften that Jones did not elaborate on what had occurred.

A week later, when Furman Starr and Robert Goodwin were arrested in possession of one-half kilo of heroin, which they were taking to Detroit, Loften made some panic-stricken calls to Socolov's telephone number. When he could reach neither Geller nor Socolov, he left a message and Socolov phoned him back later. Loften told Socolov that "those kids done got messed up" and were charged with "possession or something . . . to distribute." Since Loften indicated that he was extremely agitated, Socolov suggested that Loften come down to his office because "I want you close to where what's going on around here." After further discussions on the phone with Geller concerning bail for Starr and Goodwin, Loften told Socolov on the phone what he had learned from Geller and then continued discussing their various business dealings.

The Court does not understand Socolov to be claiming that he represented Loften or anyone else with respect to these criminal charges.[12] However, to the extent that such a claim might be made, the attorney-client privilege would not apply, for some of the reasons set forth in the Court's earlier

---

**9.** While it is contended that Harris was also a client of Socolov, there is nothing except their statements to this effect to support that conclusion.

**10.** An example of the communication to third parties of even the legal matters is the Loften-Socolov discussions concerning the terms of the proposed buyout of the existing owners' rights in the mines. Socolov advised buying out one of the parties. That idea was subsequently communicated to another business associate (Yoneishi) and to Harris. (While it is claimed that Socolov represented Harris, no such claim is made as to Yoneishi.)

**11.** *See* this Court's earlier Memorandum Decision of February 4, 1981, denying privileged status to Loften's conversations with Geller.

**12.** The claim is made that the discussions concerning Jones's arrest were privileged since Jones was Loften's business partner. However, while certain information was exchanged, no request for legal assistance was made, unless having Socolov call Jones be considered such. The discussions concerning the result of that call appear immaterial.

Memorandum Decision of February 4, 1981, denying privileged status to the Geller-Loften conversations.

■ In summary, most of the conversations are not privileged, either because they involved irrelevant matters for which no claim of privilege is asserted,[13] or because they primarily concerned the giving of business advice. What we are left with, then, are a half dozen brief conversations of the attorney-client type, which, arguably, should be pruned out of the remaining, unprivileged conversations. Even these communications, however, are not privileged, because their purpose was to further the crime charged in the indictment, namely, the investment of racketeering income in legitimate businesses. *See United States v. Friedman,* 445 F.2d 1076, 1085 (9th Cir.), *cert. denied sub nom. Jacobs v. United States,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). The fact that Socolov claims not to have known that the source of the funds was tainted[14] is irrelevant, since it is the client's purpose in consulting the attorney (and the client's privilege) that is involved. While it is argued that there was no evidence to show that the investments, and proposed investments, were to be financed by proceeds from the narcotics activities, there is an abundance of evidence from which this could be inferred. Moreover, the absence of any substantial legitimate sources of income supports this conclusion. Consequently, none of the conversations are privileged, and the motion is denied in all respects.

### Search Warrant

On November 3, 1980, a few days after the arrest of Loften and the other original defendants (which terminated the wiretaps), the United States Attorney's office obtained a search warrant for Socolov's law offices. While the affidavit in support of the warrant speaks of the investigation as involving the heroin conspiracy and the RICO transactions, the warrant itself authorizes a search only for evidence relating to the narcotics offenses. (This was apparently a clerical error.) The warrant was served by Drug Enforcement Agency agents, who, as an accommodation to Socolov, did not search his files, but permitted him, and his attorney, to select those documents that they believed were covered by the warrant. These documents were placed in a sealed box. The agents then served Socolov with a grand jury subpoena duces tecum, requiring production of certain specified documents relating to an investigation of violations of the narcotics laws and the RICO statute.

Socolov then brought on a motion before the emergency part judge (Judge Stewart) challenging the subpoena and, by order to show cause, sought a stay of the opening of the sealed box of documents seized on the warrant pending consideration of a motion, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, for the return of the seized property. On November 7, 1980, in an in camera proceeding, Judge Stewart denied the motion to suppress the warrant, finding, *inter alia,* that it adequately particularized documents connected to the drug crimes and that the warrant was obtained upon probable cause. Judge Stewart also reviewed documents that Socolov claimed were not within the warrant's scope and directed that some of these documents be turned over to the Government and some returned to Socolov. Thereafter, on two occasions, Judge Stewart also reviewed documents, as to which claims of attorney-client privilege were asserted.[15]

---

**13.** *E. g.,* the weather, birthday celebrations, and the Ali-Holmes fight.

**14.** *See* discussion of this point under the section involving the motion to dismiss, *infra.*

**15.** The Government has asked this Court to reconsider Judge Stewart's rulings based upon this Court's more extensive knowledge of the case. (This was done pursuant to Judge Stewart's approval.) Having done so, we conclude that Judge Stewart's rulings were in all respects correct, although there were some documents bearing on the RICO charges that were properly excluded from the scope of the warrant solely because of its error in failing to mention a RICO investigation. (These documents may have been covered by the grand jury subpoena.)

The Government believes that the documents produced pursuant to the grand jury subpoena were identical to those that Socolov seeks to suppress as having been obtained improperly under the search warrant.[16] With respect to the scope of the subpoena, Socolov raised issues concerning privilege, but did not challenge the subpoena as being overly broad, nor did he interpose a claim of privilege against self-incrimination. To the extent that the documents are identical, the production under the subpoena would seem to render moot any claims with respect to the search warrant. (While the subpoena is drafted in more specific terms, it is addressed to the RICO violation as well as the narcotics violations, so that, possibly, documents may have been required under the subpoena, but not under the search warrant. *See* note 15 *supra.*)

■ Socolov did argue that the search warrant failed to describe the items to be seized under the warrant with sufficient particularity and that the affidavit in support of it failed to establish any connection between the transactions involving Socolov and a violation of the narcotics law. Judge Stewart denied this motion, and that may be considered the law of the case. In any event, his ruling was clearly correct. Warrants have been approved with far more general language than that here complained of. *See, e. g., Andresen v. Maryland,* 427 U.S. 463, 478–84, 96 S.Ct. 2737, 2747–2750, 49 L.Ed.2d 627 (1976). Both Judge Stewart and the magistrate before him who authorized the warrant found that there was adequate probable cause. In light of the extensive information obtained from the wiretaps, there was substantial reason for believing that Socolov possessed records relating to Loften's assets and investments. Although the warrant did not call for RICO

materials, as has been noted above with respect to the wiretap order, the presence of large amounts of unexplained assets is evidence of participation in narcotics trafficking. *See United States v. Gomez,* 633 F.2d 999, 1009 (2d Cir. 1980); *United States v. Barnes, supra,* 604 F.2d at 146–47. The facts before the issuing magistrate, along with the inferences that he was entitled to draw, constituted probable cause for believing that evidence of narcotics trafficking would be found in Socolov's office. *See United States v. Scharfman,* 448 F.2d 1352, 1355 (2d Cir. 1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972).

■ Finally, Socolov contends that the agents, in applying for the warrant, engaged in deliberate misrepresentations and perjury to the issuing magistrate. However, there simply has been an insufficient showing, by affidavit or other proof, of deliberate falsehood and absence of probable cause to warrant an evidentiary hearing. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Steinberg,* 525 F.2d 1126, 1131 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Consequently, the motion to suppress the evidence obtained pursuant to the search warrant is denied.

### Motion to Dismiss the Indictment

In moving to dismiss the indictment,[17] Socolov of course relies on his other motions challenging the evidence as having been unlawfully obtained or obtained in violation of the attorney-client privilege. In addition, he raises no less than twelve additional grounds for dismissing the indictment. These points (as taken from the headings in his brief) are as follows:

---

16. This conclusion is apparently based on statements made by Socolov and his counsel. Obviously, the Government has not had the opportunity to compare the returned documents with the subpoenaed documents.

17. The Court has also received a brief *amici curiae* from a group of New York attorneys in support of the motion to dismiss. They argue that this prosecution could have an adverse

and chilling effect on the legal profession in a manner not intended by Congress. While some of these attorneys may be friends or former associates of the defendant and others are criminal defense counsel or civil rights lawyers with a strong bias against the RICO statute in general, a number of the attorneys listed are prominent members of the bar with no personal stake in the issues.

1. The racketeering charge does not allege involvement in a pattern of racketeering activity or receipt of racketeering income by the defendant.

2. A RICO offense requires participation in the pattern of racketeering and receipt of racketeering income.

3. The allegation of knowledge is insufficient to charge the conspiratorial *mens rea.*

4. The single completed act of legal service is an insufficient allegation for conspiracy in a fifteen year pattern of racketeering and the resultant local real estate is an insufficient interstate and foreign commerce nexus.

5. The indictment is duplicitous.

6. The statutory offense, conspiracy under 18 U.S.C. § 1962(d) to commit a violation of § 1962(a), is unconstitutional on its face and as applied.

7. Since Justice Department policy would preclude prosecution of Mr. Socolov under RICO, a hearing should be held to determine whether guidelines, procedures, and proper motives were employed in the decision to prosecute in this district.

8. The indictment does not properly charge aiding and abetting.

9. The indictment improperly charges a forfeiture against non-existent interests of Mr. Socolov in properties located at 2130–2138 Eighth Avenue.

10. This prosecution, and the statute to the extent it permits it, violates the statute of limitations, the policy of limitations, and the due process bar against delayed indictments.

11. The prosecution breached its duty to present exculpatory evidence to the grand jury and thereby violated the defendant's right to have the grand jury independently determine if the indictment was merited.

12. There was insufficient evidence before the grand jury to establish probable cause that defendant Socolov had committed a crime.

Some of these points are clearly frivolous (such as the claim that the indictment is duplicitous); others are irrelevant to the sufficiency of the indictment (such as the claim that Socolov has no interest to forfeit in the Eighth Avenue properties); still others are immaterial (such as the Government's mistaken inclusion of an aiding and abetting citation after the conspiracy count). Some of the points raised, however, are substantial and difficult to decide. The difficulties in determining these issues stem, in part, from the novelty of the indictment [18] and, in part, from the unusual statutory language defining the substantive offense and a muddy legislative history.

Socolov's principal argument is that, as to him, the indictment does not charge an offense. He contends that one who is not a principal in the predicate racketeering offenses cannot be charged with conspiring to violate RICO. Some familiarity with the background of RICO is necessary to understand Socolov's position.

Section 1962 of 18 U.S.C. provides, in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities

---

**18.** Apparently, only one other person has been indicted for being an investment adviser to racketeers, and that person was not an attorney. Moreover, he may have had greater involvement in the predicate racketeering activities than did Socolov. That person was defendant LaCava, indicted in the Southern District of California. *See United States v. Rittenberg,* No. 80–0256–S (S.D.Cal., filed Apr. 21, 1980). However, he pleaded guilty and none of the legal issues present in this case were determined in that case.

of which affect, interstate or foreign commerce. . . .

\* \* \* \* \* \*

(d) It shall be unlawful for any person to conspire to violate any of the provisions of [the] subsections . . . of this section.

Subsection 1962(a) as it was originally proposed did not include the requirement that the offender must have been a principal in the racketeering operations. Thus, it was susceptible of the interpretation that the recipients of the racketeer's investments (owners, operators, and employees of the legitimate enterprise) would also be guilty of violating the law. In order to make it completely clear that the substantive offense was not directed at legitimate businessmen, the phrase "in which such person has participated as a principal" was inserted.[19]

Socolov, who is charged with violating the conspiracy subsection, 1962(d), argues that in order to be a coconspirator seeking to violate subsection 1962(a), one must have participated in the racketeering activities and be investing his own funds.[20] The language of the conspiracy subsection, however, is not consistent with that contention, since it speaks merely of "any person" and not any person who was a principal in the racketeering offense.

Socolov initially argued that he could not be charged with aiding and abetting the commission of the substantive offense and, consequently, must also be immune from conspiratorial liability. The premise that he could not be charged with aiding and abetting the commission of the substantive offense does not appear to be supported by the case law. "[I]n the case of offenses whose prohibition is directed at members of specified classes . . . a person who is not himself a member of that class may nonetheless be punished as a principal if he induces a person in that class to violate the prohibition." *Standefer v. United States*, 447 U.S. 10, 18 n.11, 100 S.Ct. 1999, 2005 n.11, 64 L.Ed.2d 689 (1980). "There is no requirement for an aider and abettor to be within the groups whose activities are controlled by a penal statute." *United States v. Shulman*, 466 F.Supp. 293, 295 (S.D.N.Y. 1979).

In his reply brief, Socolov concedes that a criminal offense limited by its terms to a particular type of offender can be aided and abetted by a person not of that type, but argues on the basis of *United States v. Shulman, supra,* that a person not of that type cannot be charged with *conspiracy* to commit the substantive offense.

The essence of the crime of conspiracy is an agreement to commit an unlawful act. *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975). Conspiracy is a separate and distinct crime from the substantive crime that is the object of the conspiracy. *Callanan v. United States*, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961); *United States v. Clark*, 613 F.2d 391, *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). The long-accepted general rule is that one who is personally incapable of

---

19. It is not clear from the face of the statute whether this phrase modifies both "pattern of racketeering activity" *and* "collection of an unlawful debt," or whether it applies only to the latter. The legislative history indicates (and the Government apparently concedes) that it modifies both. *See* Tarlow, *RICO: The New Darling of the Prosecutor's Nursery*, 49 Fordham L.Rev. 165, 184–85 (1980).

20. This argument would not apply to the other named defendants in the count, Loften, Harris, and Jones, because they are charged with receiving income directly from a pattern of racketeering activities, including dealings in narcotics, and investing or planning to invest it in certain enterprises engaged in interstate and foreign commerce. Specifically mentioned as enterprises are the buildings on Eighth Avenue (as well as other proposed buildings), the operation of a check-cashing business, a liquor store, a pool hall, a warehouse and a restaurant at the Eighth Avenue buildings, the Arizona gold mines, the purchase and resale of diamonds, and the investment in mineral resources in Zimbabwe. Socolov's involvement, however, is alleged to be that he knew they had received their income from racketeering activities and that he counseled, facilitated, aided, and abetted them in using and investing that income in the foregoing enterprises.

committing an offense may be guilty of conspiracy to commit the offense. *United States v. Rabinowich*, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915); *Israel v. United States*, 3 F.2d 743 (6th Cir. 1925); *Vannata v. United States*, 289 F. 424, 426 (2d Cir. 1923). *See also United States v. Booty*, 621 F.2d 1291, 1297 (5th Cir.), *modified*, 627 F.2d 762 (5th Cir. 1980); *United States v. Meyers*, 529 F.2d 1033, 1037 (7th Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 253, 50 L.Ed.2d 176 (1976). While there is some precedent for the requirement that at least one of the coconspirators must be capable of committing the crime, *see, e. g., Gebardi v. United States*, 287 U.S. 112, 120, 53 S.Ct. 35, 37, 77 L.Ed. 206 (1932), that does not present a problem in this case since all three of Socolov's alleged coconspirators are also alleged to have been principals in the predicate racketeering offense.[21]

Moreover, Socolov's reliance on *United States v. Shulman, supra*, is misplaced. *Shulman* involved 26 U.S.C. § 7214(a)(4), which makes it unlawful for a United States revenue agent to conspire or collude with any other person to defraud the United States. The district court dismissed the first count of the indictment, holding that a private citizen could not be prosecuted as a conspirator under the statute. That holding is inapplicable to the instant case because the relevant statute in that case applies *only* to "revenue officers or agents," whereas the conspiracy subsection in the RICO statute applies to "any person."

Even if Socolov's argument that the modifying phrase in subsection 1962(a) should be imported into subsection 1962(d), *see* discussion *infra*, there are additional reasons why *Shulman* is inapposite. The Government argues that *Shulman* is not pertinent here, since the revenue agent was not indicted as a conspirator. Socolov responds that although the revenue agent may not have been indicted as a coconspirator, he was named as an unindicted coconspirator.

The facts of the case are not entirely clear, but it appears that the revenue agent did not consummate the fraud and became a Government witness. However, the district court's opinion does not seem to rest upon the extent to which the revenue agent conspired with the other named conspirators. Rather, the court found that Congress did not intend this statute to apply to private persons and that there was another statute that clearly applied to the defendant's conduct:

> The penalty clause of § 7214 is by its terms impossible of application to persons other than Revenue Agents. This would suggest that Congressional intention was to punish under this law only the tax agent co-conspirator participating in the typical conspiracy to defraud the revenue, which usually includes both a taxpayer and a publican. A reasonable private person not learned in the law, on reading § 7214 would not consider that it applies to him. The conduct complained of in this case is clearly punishable under §§ 201(b) and 2 of Title 18 of the United States Code. Is Congress to be presumed to have intended a redundancy?

> \* \* \* \* \* \*

> There is no public necessity for implying a crime under § 7214 in this case, because the criminal activity with which this defendant is charged is clearly violative of another federal statute carrying a higher penalty.

*Id.* at 296, 297.

In addition to his theoretical argument regarding the law of conspiracy, Socolov contends that neither Congress nor the Executive Branch ever intended for the conspiracy subsection of the RICO statute to be applied to advisers—persons who were not principals in the pattern of racketeering activities. He argues that a restrictive interpretation of the conspiracy offense is necessary to make it consistent with the substantive offense, which applies only to persons who receive income from racketeering activities.

Of course, it is the function of this Court to interpret the statute consistently with

---

**21.** *See* note 20 *supra*.

congressional intent. The Eighth Circuit has stated:

> Although we acknowledge and accept our duty to determine the meaning of RICO as applied to the controversy before us, we perceive our function as limited to ascertaining the meaning of the statute that Congress intended. Expanding the scope of RICO beyond congressional intent is judicial legislation violative of the separation of powers doctrine established in the United States Constitution.

*United States v. Anderson,* 626 F.2d 1358, 1365 n.11 (8th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981).

Unquestionably, the proposers and supporters of the legislation, in order to obtain its passage, made a number of broad statements concerning the reach of RICO, from which it can be argued that no portion of it, including the conspiracy subsection, was meant to apply to anyone but racketeers.[22] This Court is also cognizant of the warnings of the Court of Appeals for the Second Circuit that RICO should not be invoked with undue prosecutorial zeal. For example, in *United States v. Huber,* that court noted that "the potentially broad reach of RICO poses a danger of abuse where a prosecutor attempts to apply the statute to situations for which it was not primarily intended. Therefore, we caution against undue prosecutorial zeal in invoking RICO." 603 F.2d 387, 395–96 (2d Cir. 1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). *See United States v. Guiliano,* 644 F.2d 85 at 88 (2d Cir. 1981).

■■■ Nevertheless, subsection 1962(d) appears to expand the scope and reach of conspiratorial liability under RICO beyond the scope of the substantive offense in subsection 1962(a) and beyond what could be

charged under the general conspiracy statute, 18 U.S.C. § 371.[23] For example, the Fifth Circuit concluded that Congress, by passing RICO, had expanded the breadth of the conspiracy laws and created a new type of conspiracy, "enterprise conspiracy." *See United States v. Elliott,* 571 F.2d 880, 902 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). In addition, the Second Circuit has recently noted that 18 U.S.C. §§ 371 and 1962(d) define distinct offenses, which are separately punishable, in part because section 1962(d) does not require proof of an overt act and section 371 does. (The maximum penalty for the RICO conspiracy is also much greater, twenty years and $25,000, as opposed to five years and $10,000.) *See United States v. Barton,* 647 F.2d 224 at 236–238 (2d Cir. 1981).

It is also interesting to note that the proposed legislation for the contemplated Federal Criminal Code would eliminate the restrictive language in subsection 1962(a), limiting liability for the substantive offense to participants in the predicate racketeering activities. *See* Tarlow, *RICO: The New Darling of the Prosecutor's Nursery,* 49 Fordham L.Rev. 165, 189 (1980). If this change is effected, some of the problems in reconciling the language of the conspiracy subsection with the substantive subsection would be eliminated.

These inconsistencies in the statutory structure are complicated by an element of basic irrationality in the legislation. Congress quite properly feared the domination and corruption of legitimate businesses by racketeers. Logically, however, this fear should not depend upon whether or not the racketeers acquire control by the use of tainted funds. Indeed, one commentator has noted:

---

**22.** Senator McClellan, writing in response to critics of the RICO statute, which he had proposed, stated: "Unless an individual not only commits [one of the crimes listed in the Act] but engages in a pattern of such violations, and uses that pattern to obtain or operate an interest in any interstate business, he is not made subject to proceedings under Title IX." McClellan, *The Organized Crime Act (§ 30) or*

*Its Critics: Which Threatens Civil Liberties,* 46 Notre Dame L.Rev. 55, 141, 144 (1970).

**23.** Unfortunately, there are no reported judicial opinions involving a conspiracy to violate subsection 1962(a). The cases decided under subsection 1962(d) have involved conspiracies to violate subsection 1962(c).

To whatever degree society may have been disadvantaged by the original racketeering activity, it is not harmed further by investment of the proceeds. Congress apparently believed that society was disadvantaged because the racketeers would misuse the legitimate businesses in which they invested. This analysis is undoubtedly accurate, but irrelevant to the question. To the extent that racketeers, after they have acquired a new business, may engage in extortion or other crimes to advance their business interests, they violate other laws. Similarly, if the racketeers engage in securities or bankruptcy fraud, their conduct may be, and frequently is, otherwise prohibited. But subsection 1962(a) forbids any investment of "dirty money" in enterprises engaged in interstate commerce because of the speculation that some investments may be misused. Obviously, the potential for misuse depends not on whether the funds invested were derived from a pattern of racketeering activity, but on whether the individual involved is a racketeer, even if the funds came from a purely legal source. Thus, subsection 1962(a) does not forbid any inherently wrongful conduct, but merely conduct that Congress feared might later lead to harm.

Bradley, *Racketeers, Congress, and the Courts: An Analysis of RICO*, 65 Iowa L.Rev. 837, 884 (1980) (footnotes omitted). Congress may have felt that simply forbidding someone, because of his past activities, from making legitimate investments might create constitutional problems. Consequently, the statute required that the funds being invested be the fruit of illegal enterprises. The result, however, is to make the conspiracy (*i. e.*, the agreement to invest certain funds, which in turn were obtained from earlier criminal offenses) two steps removed from the inherently illegal activities (*i. e.*, racketeering) involved in the statute.

Defendant Socolov would correct this situation by arguing that to be a conspirator, one must also have been a principal (or at least an accessory) in the racketeering endeavors and be investing one's own share

thereof. However, there is nothing in the legislative history to support such a construction, which is also contrary to the usual construction of conspiracy statutes.

An outgrowth of Socolov's claim that the statute was not intended to reach an investment adviser is his argument that it is unconstitutionally vague on its face. The quick response to that challenge is that the statute has been consistently upheld as not unconstitutionally vague. *See, e. g., United States v. Aleman*, 609 F.2d 298, 305 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Huber, supra*, 603 F.2d at 393. The *amici* argue, however, that this prosecution could have an adverse and chilling effect on the legal profession and intrude upon attempts to obtain legal representation.

The first of their fears simply has no basis in this case. The *amici* contend that the indictment supports the view that an attorney can be guilty of violating RICO if he is simply generally aware that his clients are racketeers, so that attorneys would be required to investigate the source of clients' investment income before counseling legitimate investments. In this case, the Court has already held that proof of general knowledge of the client's illegal activities producing the assets for investment will not suffice. The Government has stated that it will prove that Socolov was aware that the funds to be invested were the proceeds of narcotics activities and that he had this knowledge *before* he gave investment advice.

With regard to their second fear, the *amici* argue that the services provided by Socolov are typical of those provided by attorneys engaged in corporate and commercial law. Socolov's active involvement, however, went far beyond what legal counseling would normally entail. It is not suggested that an attorney cannot advise racketeers as to the legality (or illegality) of making investments in light of RICO. What Socolov is charged with is assisting them in making investments when it was illegal for them to do so.

The most telling point made by defendant Socolov and the *amici* is that even if Socolov's activities arguably violated the conspiracy subsection of RICO, the statute failed to give fair notice of what conduct was criminal. *United States v. Dunn*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979), sets forth the fair notice requirement in the following language:

> [I]t is rooted in fundamental principles of due process, which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited. [Citations omitted.] Thus, to ensure that the legislature speaks with special clarity when marking the boundaries of criminal conduct, the courts must decline to impose punishment for actions that are not " 'plainly and unmistakably' " proscribed.

*Id.* at 112, 99 S.Ct. at 2197.

The Government argues that the publicity and debate that accompanied the passage of RICO alerted the public in general and attorneys in particular to the fact that it is illegal for criminal elements to infiltrate legitimate businesses. Surely that is so and, for that reason, *inter alia*, the constitutionality of the statute has been repeatedly upheld. *See, e. g., United States v. Aleman, supra*, 609 F.2d at 306. However, that same debate and publicity emphasized the fact that it was the racketeers whose actions would be culpable under RICO. There was no discussion whatever concerning investment advisers or others who were involved not in the racketeering or in the receipt of the income, but only in the making of the investment of the ill-gotten gains. So far as this Court can determine from the legislative history, no considera-

tion whatever was given to that limited (and perhaps specialized) group. Other than *United States v. Rittenberg*, No. 80–0256–S (S.D.Cal., filed Apr. 21, 1980), *see* note 18 *supra*, there have been no similar prosecutions,[24] and *Rittenberg* was unreported and not highly publicized.

Even if we assume that Socolov did not know that his own conduct was illegal under RICO, although he knew that the actions of Loften and his associates were illegal, by assisting them in making their investments (beyond simply giving advice as to the legality thereof), he ran the risk of being charged as an accessory after the fact. *See* Comments of Attorney General Kleindeinst, in S. Rep. No. 617, 91st Cong., 1st Sess. 121, 122, 123 (1969).[25] *See also United States v. Bollenbach*, 147 F.2d 199, 201 (2d Cir. 1945), *rev'd on other grounds*, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946). Moreover, as discussed previously, under traditional rules of conspiracy, one who is personally incapable of committing an offense can nevertheless be charged with conspiracy to commit the offense. *See United States v. Rabinowich, supra; United States v. Booty, supra*. The Supreme Court once stated: "Incapacity of one to commit the substantive offense does not necessarily imply that he may with impunity conspire with others who are able to commit it." *Gebardi v. United States, supra*, 287 U.S. at 120–21, 53 S.Ct. at 37. Finally, even if limited to legal advice, counseling a client on violations of the law violates the Code of Professional Responsibility. *See* ABA, Code of Professional Responsibility, DR 7–102(A)(7). Ethical Consideration 7–5 states clearly that an attorney may not knowingly assist a client in engaging in illegal conduct. The Committee on Professional Ethics of

---

24. As noted earlier, the defendant in that case was not an attorney. As a practical matter, because of the claims of attorney-client privilege, it would be difficult to build a case against an attorney. Only in the unusual circumstances present here, where a wiretap is being used and an attorney is overheard at sufficient length to dispute privilege claims, can a case be made.

25. Attorney General Kleindeinst, in commenting on the possible exposure of persons per-

forming services for criminals and, therefore, perhaps receiving illicit profits, suggested the remedy of inserting the phrase "from a pattern of racketeering activities." This clearly eliminated Socolov's exposure for the acceptance of fees from Loften. It does not, as discussed above, solve all of the other problems, since, as the Attorney General noted in the same paragraph, the prohibitions were intended to be aimed "primarily" (and it follows, therefore, not exclusively) at racketeers.

the American Bar Association has stated: "For a lawyer to represent a syndicate notoriously engaged in the violation of the law for the purposes of advising the members how to break the law and at the same time escape it, is manifestly improper." ABA Committee on Professional Ethics, Opinion No. 281 (1952).

Socolov's general knowledge of the illegality and immorality of his actions, however, is not sufficient to establish conspiratorial *mens rea.* "Where freedom is at stake, ambiguities and doubts as to statutory application . . . must be resolved in favor of the accused." *United States v. Insco,* 496 F.2d 204, 209 (5th Cir. 1974). Even if the general purpose of the statute is served by inclusion within its ambit of a defendant who must have known that his actions were improper, such a defendant cannot be convicted unless the statute gave fair notice that the activity was criminal. *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), *rev'g* 588 F.2d 1358, 1365 (2d Cir. 1978).

Undoubtedly, whether Socolov had fair notice is a close question. While motions to dismiss are ordinarily determined before trial, Rule 12(e) provides that they may be deferred until trial of the general issue if the court so orders. Such a deferral is particularly appropriate where a constitutional question can be clarified by the evidence to be presented at trial. 1 C. Wright, *Federal Practice and Procedure* § 194 (1969). The evidence necessary to establish Socolov's knowledge of the racketeering activities of the other defendants may be circumstantial evidence of intent and knowledge for the RICO offense. Since that proof is part of the foundation of the prosecution, it is perhaps better not resolved without hearing all of the evidence. *See United States v. Treadway,* 312 F.Supp.

307 (D.C.Va.1970); *United States v. J. R. Watkins Co.,* 16 F.R.D. 229 (D.Minn.1954).

Moreover, it may well be (as the Government argues) that this issue goes beyond the face of the indictment and need not be considered before the time the jury is charged. While defendant Socolov has not as yet made the argument, it has been suggested that under this specific conspiracy subsection, which makes it unlawful "to conspire to violate the provisions of subsections . . . of this section," the Government is required to prove that the defendant had knowledge of the substantive statutory offense and agreed with others to violate it. One commentator has noted:

Thus, the wording of subsection 1962(d) suggests that, in a RICO conspiracy, knowledge of illegality is required—as distinguished from the provisions of the general conspiracy statute in which only an agreement to perform certain physical acts is necessary.

Under the foregoing analysis of a conspiracy to violate subsection (a), the "conspiracy to violate RICO" provision of subsection 1962(d) must be read literally to require a showing that the defendants specifically agreed to violate subsection 1962(a). Such an intent will be virtually impossible for the prosecution to show, and, therefore, it follows that convictions of subsection 1962(a) conspiracies should be largely precluded.

Bradley, *supra,* 65 Iowa L.Rev. at 885–86 (footnotes omitted). While it undoubtedly will be very difficult in most instances for the Government to show such intent and knowledge, it may not be impossible where the defendant is an attorney.[26]

■ The remaining points raised by defendant Socolov merit only brief discussion.[27] Socolov challenges the indictment

---

**26.** The Government might have avoided this problem by also prosecuting Socolov under the general conspiracy statute, 18 U.S.C. § 371. However, the Supreme Court has recently held that where Congress adds a specific provision applicable to particular predicate crimes, the specific provision applies to those predicate crimes to the exclusion of a pre-existing general statute of the same type. *See Busic v. Unit-*

*ed States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980); *Simpson v. United States,* 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978). *But see United States v. Barton, supra,* 647 F.2d at 236–237.

**27.** Socolov has raised so many points and briefed them so extensively that this opinion does not profess to address itself to all of the

on the ground of noncompliance by the United States Attorney's office with its own RICO guidelines before commencing this prosecution.[28] As the Court has previously held with respect to the wiretaps (*see* Memorandum Decision of May 22, 1981), internal Government policies do not create rights in private citizens. The United States Attorney's Manual itself specifically states that it is not intended to, does not, and may not be relied upon to, create any rights whatever in any party.[29] While the case of *United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969), may be somewhat to the contrary, its doctrine has not been adopted in this circuit. *See United States v. Shulman, supra*, 466 F.Supp. at 297–99. Moreover, the Court has made an in camera review of the correspondence between the United States Attorney's office and the Department of Justice and finds that the prosecution was properly authorized.

■ The failure to describe Socolov's interest under the foreclosure provision of RICO is not a violation of Rule 7(c)(2) of the Federal Rules of Criminal Procedure. If there is a dispute as to the extent (if any) of Socolov's ownership interest in the Eighth Avenue property, the jury will be called upon to make a specific finding. *See United States v. Smaldone*, 583 F.2d 1129 (10th Cir. 1978), *cert. denied*, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979).

■ Finally, Socolov attacks the grand jury proceedings in several respects, including the alleged failure to present exculpatory evidence, the claimed insufficiency of evidence before the grand jury, and the alleged failure of the United States Attorney's office properly to advise the grand jury of the necessary elements of the criminal offense. The Court has made an in camera review of portions of the grand jury proceedings. Initially, it should be noted that what Socolov contends is exculpatory evidence (a conversation between

Loften and Harris in which they indicated a low opinion of Socolov) is far from exculpatory evidence. Moreover, this taped conversation, like all of the others, was made available to the grand jury. Even if the conversation could arguably be said to be evidence raising a question about Socolov's knowledge of the activities of Loften and his associates, there is no obligation on a prosecutor to search out and submit all evidence that is in any way favorable to a defendant. *See United States v. Ciambrone*, 601 F.2d 616 (2d Cir. 1979). While the direct evidence of Socolov's knowledge of the racketeering source of the investment funds may not have been overwhelming, it was adequate for purposes of probable cause.[30] The indictment is sufficient to call for a trial of the charges on the merits. *See United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956); *United States v. Schlesinger*, 598 F.2d 722, 726 (2d Cir.), *cert. denied*, 444 U.S. 880, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979). Finally, the Government's explanation to the grand jury of the necessary elements of the crime was totally consistent with its present position on the law and unusually frank in directing the grand jury's attention to the debatable factual aspects of its case. The Court concludes, therefore, that the grand jury proceedings were in all respects proper.

The motion to dismiss the indictment is denied at this time, without prejudice to renewal at an appropriate point in the proceedings.

SO ORDERED.

---

arguments. To the extent not covered, they were considered to be insignificant.

**28.** *See* United States Attorney's Manual, Title 9, § 110.101.

**29.** United States Attorney's Manual, Title 1, § 1–1.100.

**30.** Socolov twice refused offers to testify himself before the grand jury.