**Kenneth JOHNSON, Petitioner,**

**v.**

**WARDEN, AUBURN CORRECTIONAL FACILITY, Respondent.**

**No. CV 83–2057.**

United States District Court, E.D. New York.

March 1, 1984.

**7.** The practical effect of our decision is that plaintiff will receive rents for a total of fourteen (14) months.

Richard Ware Levitt, Rudin & Levitt, New York City, for petitioner.

Elizabeth Holtzman, Kings County Dist. Atty. by Nikki Kowalski, Asst. Dist. Atty., Brooklyn, N.Y., for respondent.

## MEMORANDUM & ORDER

PLATT, District Judge.

Petitioner, Kenneth Johnson, has asked this Court to issue a writ of habeas corpus, pursuant to 28 U.S.C. § 2254 (1976), on the grounds that his continued imprisonment by the State of New York violates certain rights secured to him by the United States Constitution. For the reasons that follow we decline to issue such a writ and order the petition dismissed.

### I

#### A

Petitioner was convicted on July 11, 1973 in New York State Supreme Court, Kings County, after a jury trial, of murder and attempted murder. He was sentenced to a prison term of 25 years to life. Petitioner's conviction was upheld by the New York State Supreme Court, Appellate Division, Second Department, on July 24, 1974, with one Justice dissenting. *See People v. Johnson*, 45 A.D.2d 1030, 357 N.Y.S.2d 892 (2d Dept.1974). The New York State Court of Appeals unanimously affirmed petitioner's conviction on July 10, 1975. *See People v. Johnson*, 37 N.Y.2d 778, 375 N.Y. S.2d 97, 337 N.E.2d 605 (1975).

## B

The following facts were proven at trial: On April 7, 1970, a man later identified as petitioner entered a luggage store owned by an elderly woman named Mrs. Jenny Laffer and located at 507 Pennsylvania Avenue in Brooklyn, New York, three times, in search, he said, of a briefcase for his son. This person did not touch any paper bags, nor did he buy anything during any of these visits. He was waited on each time by Mrs. Jenny Laffer's daughter, Phyllis Laffer, who was helping her mother while on a day off from her normal job. Also working that day was Mrs. Jenny Laffer's other daughter, Gertrude Laffer, who regularly tended the store with her mother. All three members of the Laffer family lived together in an apartment above the store.

The next day, April 8, 1970, this same man entered Mrs. Jenny Laffer's luggage store four times. Ms. Gertrude Laffer was tending the store with her mother this day and waited on this person each time; on one such occasion he came in with a boy and purchased an envelope for two dollars. At 1:00 PM, Ms. Gertrude Laffer was in the back of the store when she heard her mother calling her. Coming to the front of the store, Ms. Gertrude Laffer saw a man she later identified as petitioner beating her mother with his fists and a nail studded piece of wood. When Ms. Gertrude Laffer asked the man to stop beating her mother he replied "I will kill her and then I will kill you." The man beat Ms. Gertrude Laffer with his fists, broke her jaw, broke several teeth; her face was so swollen as to require a tracheotomy to allow her to breath. Mrs. Jenny Laffer died of her wounds.

The Laffer's store was ransacked, as was their upstairs apartment.

The subsequent police investigation turned up a pair of matching fingerprints; one on a paper bag found within the store, and one on a bureau in the upstairs apartment. In addition, detectives got an unverified report that 3 persons, 2 black males and one black female, were seen leaving the Laffer's store around 3:00 PM on the afternoon of the murder.

The police investigation continued until February of 1971, when petitioner was located and subsequently arrested. During an interview with police, after having been given a *Miranda* warning, he denied ever having been in the Laffer's store. Petitioner was identified by each of the Laffer sisters from a photo spread and later at a line-up. In addition, the prints discovered in the store and the apartment were found to match petitioner's.

## C

Petitioner was indicted in May, 1971, and after arraignment the case was adjourned to enable petitioner to obtain private counsel. When petitioner failed to retain an attorney within a few months, the Court appointed Morris Shulslapper, Esq., to represent petitioner. Several further adjournments were granted, as petitioner continued to search for private counsel.

In January of 1972, petitioner's case was marked over into the trial part. Again, adjournments were given to petitioner to obtain private counsel. In addition, the Court ordered a psychiatric examination of the petitioner. On February 1, 1972, petitioner was found competent to proceed, and a *Wade* hearing was begun on February 7, 1972. During the course of the hearing, petitioner asked to be permitted to withdraw his previously entered plea of not guilty, and to plead guilty to one count of manslaughter, in satisfaction of the entire indictment. This petitioner was permitted to do, but on April 5, 1972, the date of sentencing, petitioner stated that he wished to withdraw his guilty plea, stating that he had not realized what he was doing, and that Mr. Shulslapper had coerced him into pleading guilty. The Court relieved Mr. Shulslapper of his appointment and ordered petitioner to undergo another psychiatric examination. In September of 1972, with Joseph Lombardo, Esq.,[1] now representing petitioner as assigned counsel, petitioner

---

1. Presently Mr. Justice Joseph Lombardo, Kings County Supreme Court.

was allowed to withdraw his guilty plea. After further adjournments to enable petitioner to obtain private counsel the case was marked ready for trial in February of 1973. At this time hearings were held to determine if petitioner was competent to stand trial. Mr. Lombardo asked that petitioner be examined by a private psychiatrist. Such application was granted, but when the psychiatrist attempted to interview petitioner, petitioner refused to see him.

Petitioner then asked that he be allowed to get a new attorney. While this request was still pending, the *Wade* hearing was continued and a jury was picked. On February 27, 1973, with seven jurors sworn, petitioner asked for an adjournment, indicating that he had hired a private attorney. The Court granted the adjournment and attempted for two days to confirm the petitioner's new arrangement with counsel. When this could not be done, a mistrial was declared and Mr. Lombardo's motion to be relieved was granted.

On March 1, 1973 Robert Riordan, Esq., was appointed to represent petitioner, who still insisted that he was attempting to retain private counsel. On March 8, 1973, the case was called and Mr. Riordan indicated that although petitioner was still attempting to retain other counsel, Mr. Riordan was prepared to go to trial as petitioner's attorney. Mr. Riordan noted that he had consulted with Mr. Johnson and had read the *Wade* hearing minutes. The next day, petitioner was granted a further adjournment to seek private counsel.

### D

On Monday, March 12, 1973, with no private counsel retained and Mr. Riordan apparently prepared to proceed, the trial was commenced and a jury selected. Mr. Justice John Starkey had just completed giving his preliminary instructions to the jury when the petitioner screamed "what about me?" and overturned the counsel table.

At this point the jury was removed from the courtroom. Mr. Justice Starkey advised the petitioner that while he had the right to be present throughout the proceedings, such outbursts would not be tolerated, and petitioner had a choice of either behaving himself, being bound and gagged, or leaving the courtroom. When the petitioner indicated that he would prefer to leave the room, Mr. Justice Starkey again advised him, this time in detail, of the rights he would forfeit by such an action. Petitioner then said "I can't understand now. My head is spinning." Although Mr. Justice Starkey indicated that he thought petitioner was faking, he again granted an adjournment, this time to the next morning.

While the colloquy about petitioner's presence in the courtroom was going on, petitioner expressed his dissatisfaction with being represented by Mr. Riordan. To this Mr. Riordan replied that although petitioner had refused to speak to Mr. Riordan, indeed had "never told [him] anything about the case", Mr. Riordan had read the records and minutes compiled during the almost two years the case had been pending and felt that he was ready to proceed.

Petitioner's trial began the next morning. At the outset Mr. Justice Starkey warned the petitioner that outbursts like that of the previous day would not be tolerated. Petitioner replied by asking repeatedly that he be allowed to leave. After petitioner had asked for the fourth time to be permitted to leave the courtroom and after Mr. Justice Starkey had explained the alternatives to him, petitioner was allowed to leave the courtroom.

As the trial opened, Mr. Justice Starkey informed the jury that petitioner had asked to be permitted to leave the courtroom and that this request had been granted.

After the People had opened, Mr. Riordan made a brief opening statement. In it he asked the jury not to let the unusual occurrence of the day before or the defendant's absence from the trial stop them from weighing the evidence with an open mind.

As the trial proceeded it became evident that petitioner would be needed in the

courtroom so that Ms. Phyllis and Ms. Gertrude Laffer could identify him. Although petitioner protested at being brought back into the courtroom, he sat at the defense counsel table while Ms. Phyllis Laffer began testifying. Before Ms. Phyllis Laffer could identify petitioner, he fell to the floor. Mr. Justice Starkey noted for the record that in his opinion, the petitioner did not slump, but deliberately threw himself on the floor. Mr. Riordan noted that while petitioner was conscious, he wasn't responding like a normal person, and that Mr. Riordan couldn't tell if the fit was self-induced or not. Mr. Justice Starkey had petitioner's coat pulled back to expose his face and proceeded with the identification. Ms. Phyllis Laffer testified that petitioner was the man she had waited on the day before the murder. Before cross-examination, petitioner was removed from the courtroom and apparently walked off normally once the courtroom doors closed behind him.

The petitioner was brought back into the courtroom for the testimony of Ms. Gertrude Laffer, who identified him as the man who killed her mother and beat her so severely. Petitioner's stay in the courtroom this time was uneventful, and petitioner remained in court for the remainder of the trial.

During the cross-examination of Detective Wright, Mr. Riordan elicited the fact that when petitioner was first questioned about the crime he denied ever having been in the store at 507 Pennsylvania Avenue.

In his summation, Mr. Riordan pointed out to the jury that eleven (11) months had elapsed between the crime and the identification of the petitioner, that the Laffer sisters might not be reliable eyewitnesses, and that the fingerprint experts might be mistaken. Mr. Riordan also reminded the jury to keep an open mind, and not to consider petitioner's actions in the courtroom or his decision not to testify, in reaching a verdict.

The jury deliberated for three hours before returning a verdict of guilty on all counts.

After the jury was discharged, petitioner volunteered that he had acted improperly in court because he was afraid he would not get a fair trial. He was, however, now satisfied that he had indeed had a fair trial.

## II

Petitioner's arguments in support of his petition for a writ of habeas corpus are that he was denied effective assistance of counsel and that he did not knowingly and voluntarily absent himself from his trial. For the reasons we discuss below, each of these arguments is without merit.

### A

■ As a preliminary matter, we note that both of the arguments raised in the present petition were presented to and passed on by the New York State appellate courts on petitioner's direct appeal. *See People v. Johnson*, 45 A.D.2d 1030, 357 N.Y.S.2d 892 (2 Dept. 1974), judgment affirmed 37 N.Y.2d 778, 375 N.Y.S.2d 97, 337 N.E.2d 605 (1975). Thus we hold that petitioner has exhausted his State remedies, and may proceed under 28 U.S.C. § 2254 (1976). *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

### B

■ The Second Circuit Court of Appeals has recently altered the standard which district courts are to employ when reviewing claims of ineffective assistance of counsel. In *Trapnell v. United States*, 725 F.2d 149 (2d Cir.1983), the court discarded its former "farce and mockery" standard, first adopted in *United States v. Wight*, 176 F.2d 376, 379 (2d Cir.1949), *cert. denied*, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950), in favor of the now more prevalent "reasonably competent" standard. Thus the performance of Mr. Riordan in conducting petitioner's defense must be judged against that of a reasonably competent attorney performing under similar circumstances. *United States v. Easter*, 539 F.2d 663, 666 (8th Cir.1976).

■ Petitioner levels several criticisms against Mr. Riordan, which we will examine seriatim. The first general complaint is that Mr. Riordan, who took on petitioner's case only twelve (12) days prior to trial, was improperly prepared for trial. We cannot agree. The record indicates that Mr. Riordan read all of the records and minutes compiled over the two year period while the case was pending. It also indicates that petitioner himself refused to consult with Mr. Riordan while the latter was preparing his defense. Mr. Riordan stated several times that he was prepared to proceed and, after reviewing his performance at trial, including his objections and cross-examinations, we agree.

■ Petitioner next criticizes Mr. Riordan for the manner in which he handled petitioner's shenanigans at trial. While petitioner makes much of Mr. Riordan's rather objective comments about petitioner's actions, such as describing his "fit" during Ms. Phyllis Laffer's testimony as a "self induced or medical fit. I don't know.", we think that Mr. Riordan should not be criticized for his method of handling these events. As the trial proceeded, Mr. Riordan was faced with the choice of trying to ignore his client's conduct, supporting and defending the conduct, or acknowledging it but keeping the jury's attention focused on the issues at trial. Mr. Riordan obviously chose this last approach which, under the circumstances, seems to us to be a choice which "reasonably competent" counsel would make. Moreover, district courts in this circuit should be "reluctant to second guess matters of trial strategy simply because the chosen strategy has failed." *United States v. Helgesen*, 669 F.2d 69, 72 (2d Cir.), *cert. denied*, 456 U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982); *United States v. Aulet*, 618 F.2d 182, 189 (2d Cir. 1980).

■ The next criticism of Mr. Riordan is that he improperly bolstered the eyewitness identification of plaintiff by the Laffer sisters during the cross-examination of Detective Wright. A close reading of Mr. Riordan's cross-examination of Detective

Wright shows that Mr. Riordan was probing Detective Wright's testimony for indications of suggestive line-up procedures or tentative identifications. Such probing was well in keeping with Mr. Riordan's apparent trial strategy of attacking any and all identification of petitioner. The unavoidable result of the unsuccessful cross-examination was that the identification of petitioner was bolstered. We will not second guess Mr. Riordan's decision to risk such bolstering for the possibility of undercutting evidence which was crucial to the People's case. *Aulet, supra.*

■ Petitioner's most vehement criticism is leveled at Mr. Riordan's overall trial strategy, and especially at his summation. Before exploring this area it is necessary to lay out some background. As noted above, petitioner told police when he was first arrested that while he was familiar with Mrs. Jenny Laffer's store, he had never been inside of it. There were no grounds upon which to exclude this statement if the People had wanted to bring it out. Thus Mr. Riordan was faced with a difficult choice. He could put forth the defense urged now by petitioner, i.e., that the prints and eyewitness identification could be explained away by suggesting that petitioner was in the store before or after the murder, perhaps as a looter. Alternatively, he could argue, as he did, that petitioner had never been in the store and that the fingerprint experts and eyewitnesses were wrong.

The defense urged now by petitioner is not as strong as petitioner seems to suggest. First, making this argument would have invited the People to bring out petitioner's earlier statement that he had never been in the store, thereby making petitioner out to be a liar with a guilty conscience. Second, admitting that petitioner might have been in the store would have bolstered the prosecution's chief evidence, the testimony of Ms. Gertrude Laffer. If the defense conceded that Ms. Gertrude Laffer might have seen petitioner on the day before the murder, it would have a much harder time attacking her identification of

petitioner as the man who beat her and killed her mother. Third, Mr. Riordan might reasonably have concluded that it was too risky to ask the jury to place the petitioner at the scene before the crime, and after the crime, but not during the crime.

Against this background, Mr. Riordan's defense and summation, where he attacked all forms of identification, including the fingerprint identification, seem to this Court to be a choice a reasonably competent attorney might make in similar circumstances. Although the argument that two persons might have the same fingerprints does seem to us to be somewhat weak, it was consistent with the suggestion to the jury that it was not up to the fingerprint experts to decide whether the prints were the same, that question was for the jury. This approach was totally in keeping with Mr. Riordan's earlier cross-examination of the fingerprint experts, as well as the instructions of the Court both before trial and in the jury charge (Tr. p. 276).

■ Petitioner's last criticism is that Mr. Riordan failed to object to the Court's charge that he "must state" "on request of the defendant", that petitioner's failure to testify could not be used against him. While we agree that this charge is improper under New York State law, *see: People v. Sharp*, 71 A.D.2d 1034, 420 N.Y.S.2d 396 (1979); *People v. Muir*, 51 A.D.2d 859, 379 N.Y.S.2d 564 (1976), we do not feel that the failure to object in this case rises to a constitutional violation. Petitioner would have a heavy burden of demonstrating that the instruction itself rose to a constitutional violation, *see Henderson v. Kibbe*, 431 U.S. 145, 153, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977), and we think that petitioner bears an even heavier burden in demonstrating that the failure by his court-appointed counsel to object to this charge rises to the level of a constitutional violation, a burden he has not met.

### C

■ Petitioner also argues that he did not knowingly and voluntarily absent himself from his trial. On this record this argument is without merit.

Petitioner, who spent almost two years adjourning this case on the grounds that he was attempting to retain counsel, threw over a table and screamed "what about me" just as a jury was sworn and instructed. When Mr. Justice Starkey informed petitioner of his right to be present at his trial, petitioner protested stating that his head was spinning. The next day petitioner asked four (4) times to be allowed to leave the room. When he was brought in to be identified, he suddenly slumped to the floor, only to walk off normally when removed from the courtroom. Given these circumstances, we are inclined to agree with eleven (11) of the twelve (12) Judges in the New York State appellate courts, that petitioner had, by his actions, made a knowing and voluntary waiver of his right to be present at his trial. *United States v. Barton*, 647 F.2d 224, 238 (2d Cir.1981).

In *Barton*, the Second Circuit found a voluntary and knowing waiver where the defendant, who had known of the commencement of his trial for almost two months, scheduled non-emergency back surgery for the eve of trial, a trial presided over by a designated judge whose availability was limited to the scheduled period. There were no instructions given to that defendant about his right to be present at trial. Moreover, Barton was absent for the entire trial. In this case, petitioner only missed the testimony of three witnesses, and part of a fourth. In addition, petitioner was given full instructions as to his right to be present at trial on at least one occasion and forestalled any other instructions by his repeated demands to be allowed to leave the trial. Under the circumstances of this case, petitioner's claim that his rights to be present at trial were violated is without merit.

### D

For the reasons outlined above, petitioner's petition for a writ of habeas corpus must be, and hereby is, dismissed.

SO ORDERED.